### INTERNATIONAL ASSOCIATION OF ENTREPRENEURS OF AMERICA BENEFIT TRUST, et al., Plaintiffs,

v.

### Steven T. FOSTER, Commissioner of Insurance, State Corporation Commission of the Commonwealth of Virginia, Defendant.

Civ. A. No. 3:94cv454.

United States District Court,
E.D. Virginia,
Richmond Division.

April 28, 1995.

David F. Peters, Mark S. Dray, Hunton & Williams, Richmond, VA, B.H. Hubbard, III, Rumsey, Breeden, Hubbard, Bugg & Terry, Irvington, VA, for plaintiffs.

Anthony J. Gambardella, Jr., Peter B. Smith, Michael D. Thomas, State Corp. Com'n, Office of Gen. Counsel, Richmond, VA, for defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

This action was initiated by International Association of Entrepreneurs Benefit Trust and related entities seeking: (1) a declaratory judgment that the Commissioner of Insurance lacks jurisdiction under Va.Code § 38.2–3420 to regulate the IAEA Trust in its offering and providing of employee bene-

fits; (2) a declaratory judgment that application of Virginia Insurance Regulation No. 31 to the IAEA Trust is preempted by ERISA; and (3) a permanent injunction prohibiting the Commissioner and his agents from exceeding their jurisdictional authority with regard to the IAEA Trust and from applying Insurance Regulation No. 31 to the IAEA Trust and its related benefits plan. The thrust of the plaintiffs' claims is that the Virginia statutes are pre-empted by the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001, *et seq.* ("ERISA"). Following completion of discovery, the parties submitted affidavits, documentary evidence and briefs in support of their respective positions. Eschewing further evidentiary proceedings, they then submitted the action for decision on those pleadings and supporting papers. For the reasons set forth below, judgment is entered in favor of the defendant and the action will be dismissed.

## STATEMENT OF FACTS

The International Association of Entrepreneurs of America ("IAEA Association") was formed in 1990 as a Texas unincorporated association of approximately 40 employers who were signatories to a collective bargaining agreement with United Labor Council Local Union 615 ("Local 615"). In December 1992, the IAEA Association was incorporated as a Texas non-profit corporation. Also in December of 1992, the Association established the International Association of Entrepreneurs Benefit Trust ("IAEA Trust") under the laws of the state of Wisconsin. Ross N. Fuller is the trustee of the IAEA Trust ("Fuller" or the "Trustee"). A corresponding benefit plan ("IAEA Plan") was subsequently adopted.

Sometime in 1992, shortly before the IAEA Trust and IAEA Plan were established, defalcations in the operation of Local 615's benefit plan were discovered and it was determined that Local 615's plan was insolvent. The employer members of the IAEA Association who were Trust participants authorized the Trustee to pay outstanding benefit claims to their members who had been covered by the now defunct Local 615 Plan.[1]

The IAEA Association provides a number of services to its member employers. These include a safety engineering program, an auto rental program, discounts on dining and eye wear, emergency cash advances, lost credit card notification, a travelers physician network, periodic newsletters and various other informational material.

The IAEA Trust was established to provide health care services and benefits, disability benefits, death benefits and accident benefits to eligible employees of the employer members of the IAEA Association and to employees of the IAEA Association. The Trust is formally controlled by a Benefit Review Committee ("BRC"). The BRC consists of not fewer than three and not more than nine employers, or officers or employees of employers, who are members of the IAEA Association participating in the Trust. However, according to the Restatement of Agreement and Declaration of Trust, the Trustee served as the initial BRC until June 30, 1993.

---

1. In their pleadings and supporting papers, the IAEA Trust and its Trustee stop noticeably short of stating that assistance of those employees who had been covered by the Local 615 plan was the sole or even primary reason that the IAEA Plan and the IAEA Trust were adopted. Instead, their argument generally takes this form:

 [T]he IAEA Trust and Plan were established by the IAEA Association *when it was discovered* that the Local 615 employee benefit plan was insolvent and could not meet its obligations to the employers' employees. As Mr. Fuller explains, the employer members of the IAEA Association who were then participating in the IAEA Plan authorized the Trustee to pay approximately $400,000 in claims of their employees who had formerly been covered under the Local 615 Plan.

 (Plaintiff's Mem. in Opposition to Motion to Dismiss, pp. 20–21). However, nothing in the evidence demonstrates that the insolvency of the Local 615 Plan actually caused the creation of the IAEA Trust and the IAEA Plan. In fact, evidence submitted by the plaintiffs suggests that other factors were at play. In a letter to the Commission, the IAEA Association represented that: "the employers in question became concerned about the operation and administration of the union's health and welfare benefit plan and established the Association to deal with these concerns *and their common entrepreneurial interests.*" (Complaint, Exhibit F, p. 2) (emphasis added).

(Restatement of Agreement and Declaration of Trust, p. 25, Complaint, Exhibit A). It was during this period, in December of 1992, that the BRC, at that time the Trustee, established the IAEA Plan.

The Restatement of Agreement and Declaration of Trust provides that there will be a written agreement between the BRC and an Administrator, by which the BRC may confer duties and responsibilities on the Administrator. The BRC may confer on the Administrator any responsibility or duty conferred upon it by the Restatement of Agreement and Declaration of Trust, including "general and complete managerial authority over the day to day affairs of the Trust and any Employee Welfare Benefit Plan established pursuant to this Trust." Restatement of Agreement and Declaration of Trust, p. 22 (Complaint, Exhibit A). The Trustee, Mr. Fuller, is responsible for holding and investing any trust funds held by the IAEA Trust.

The plaintiffs do not make clear how, in theory, the IAEA Association was to solicit new members. The Commissioner, however, has submitted evidence of how this actually occurs. The evidence indicates that independent insurance agents were used to market membership in the IAEA Association in much the same way that an entrepreneurial insurance venture would market itself. There is nothing in the solicitation materials or application for membership in the IAEA Association that suggests that IAEA Association membership is limited to businesses in any particular industry or to businesses of any particular type.

On October 20, 1993, the Bureau of Insurance of the State Corporation Commission ("SCC") initiated an inquiry into the insurance related activity of the IAEA Trust in Virginia. The Commissioner informed the Trustee that the Trust may be subject to Virginia Insurance Regulation No. 31 ("Regulation 31") which provides in pertinent part:

[A] multiple employer welfare arrangement that is not fully insured as defined in this regulation shall not operate in this Commonwealth *without first meeting the criteria and becoming appropriately licensed as an insurance company, health maintenance organization, health services plan, or a dental or optometric services plan pursuant to Title 38.2 of the code of Virginia.*

Regulation 31, § 5(A) (Complaint, Exhibit E) (emphasis added).

Over the course of several months following the October 20 letter, a series of letter exchanges followed between Mr. Gales of the SCC and counsel for the Trust and Trustee addressing the structure and operations of the IAEA Trust.

On April 25, 1994, Mr. Gales received a memorandum from a licensed Virginia Insurance company indicating that a representative of Employers Cost Management Company, Inc., a Virginia corporation, had made a presentation to a Virginia Employer about benefits available through the IAEA Trust. (Gales Affidavit, March 23, 1994 ("First Gales Affidavit"), Exhibit 15). Accompanying this memorandum were copies of solicitation materials concerning the IAEA Trust and Plan. (First Gales Affidavit, Exhibit 15).

On April 27, 1994, the SCC sent a Property and Casualty Insurance Investigator to the office of Employers Cost Management Company in an attempt to obtain information about the insurance operations of the IAEA Trust in Virginia. The investigator was denied access to any records.

On May 3, 1994, the SCC advised the Trustee that the IAEA Trust must comply with Regulation 31 on or before May 13, 1994. That deadline was subsequently extended to May 20, 1994. On May 20, 1994, the IAEA Trust communicated to the SCC the basis for its position that the IAEA Trust is not subject to Virginia Code § 38.2–3420 and Regulation 31. On June 1, 1994, the Trustee and his counsel met with the SCC staff and, notwithstanding their position that the Commissioner lacked jurisdiction to regulate the IAEA Trust and the IAEA Plan, offered to provide information to the SCC on an ongoing basis to satisfy the SCC as to the adequacy of the IAEA Plan and its reserves and contributions. That offer was confirmed in writing on June 7, 1994.

On June 23, 1994, the SCC issued a subpoena requiring certain third parties to provide records relating to the operation of the

IAEA Trust in Virginia. On July 1, 1994, the IAEA Trust and the Trustee filed this action for declaratory judgment and injunctive relief.

## DISCUSSION

The plaintiffs, of course, have the burden to prove all elements of their claim by a preponderance of the evidence. To succeed in their argument that ERISA preempts the efforts of the SCC to require the IAEA Trust to comply with Regulation 31, plaintiffs must prove both that the IAEA Plan is an ERISA covered Employee Welfare Benefit Plan and that the SCC's application of Regulation 31 is not saved from preemption by ERISA's MEWA Clause. 29 U.S.C. § 1144(6)(A).

### A. ERISA Coverage Of The IAEA Plan

The threshold issue is whether the IAEA Plan is covered by ERISA.[2] Both parties agree that the IAEA Plan is a Multiple Employer Welfare Arrangement ("MEWA") as defined both by ERISA and by Virginia law. 29 U.S.C. § 1002(40)(A); Regulation 31, § 4, (First Gales Affidavit, Exhibit 1). A MEWA is covered by ERISA if it is also an Employee Welfare Benefit Plan ("EWBP"). 29 U.S.C. 1002(3). Whether a plan is an EWBP as defined by ERISA is a question of fact. *MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 182 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992); *Plog v. Colorado Ass'n of Soil Conservation Dists.*, 841 F.Supp. 350, 352 (D.Colo.1993).

ERISA defines an EWBP as follows:

> The terms "employee welfare benefit plan" and "welfare plan" mean any plan, fund or program which was heretofore or is hereafter *established or maintained by an employer or by an employee organization, or by both,* to the extent that such

plan, fund or program was established or is maintained for the purpose of providing for its participants or beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in Section 186(c) of this title (other than pensions on retirement or death and insurance to provide such pensions).

29 U.S.C. § 1002(1) (emphasis added).

It is undisputed that the IAEA Plan provides the type of benefits described in the definition of an EWBP, and that the IAEA Plan was not established or maintained by an employee organization. The issue presented in this action is whether the IAEA Plan was established or is maintained by an "employer" within the meaning of ERISA.

The starting point of this inquiry is the text of ERISA, which states that the term "employer" means "any person acting directly as an employer, or indirectly in the interest of an employer in relation to an employee benefit plan; and *includes a group or association of employers acting for the employer in such capacity.*" 29 U.S.C. § 1002(5) (emphasis added). Unfortunately, this provision provides no more specific guidance on its face as to what constitutes an "association of employers acting for the employer." As a result of this expansive language, soon after ERISA was enacted numerous entrepreneurs organized supposed "associations" to provide insurance products free from state regulation. In 1977, Congress specifically addressed this trend:

> [C]ertain entrepreneurs have undertaken to market insurance products to employers and employees at large, claiming these

---

**2.** Counsel for the SCC urges the court to bypass this issue and proceed directly to the issue of preemption, arguing that, if the IAEA Plan is covered by ERISA, the SCC may still require that the IAEA Trust be licensed because it is, by its own admission, a MEWA. Although this position is attractive for its simplicity, the court must engage the issue of ERISA coverage because the court's jurisdiction is founded on the federal

question whether ERISA preempts application of Regulation 31 to the IAEA Plan. If the IAEA Plan is not covered by ERISA, federal question jurisdiction evaporates. *See MDPhysicians & Assocs., Inc. v. State Bd. of Ins.*, 957 F.2d 178, 182 (5th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992); *State of Texas v. Alliance Employee Leasing Corp.*, 797 F.Supp. 542, 546 (N.D.Tex.1992).

products to be ERISA covered plans. For instance, *persons whose primary interest is in profiting from the provision of administrative services are establishing insurance companies and related enterprises.* The entrepreneur will then argue that his enterprise is an ERISA benefit plan which is protected under ERISA's preemption provision from state regulation. *We are concerned with this type of development, but on the basis of the facts provided us, we are of the opinion that these programs are not "employee benefit plans" as defined in Section 3(3).* As described to us, these plans are *established and maintained by entrepreneurs for the purpose of marketing insurance products or services to others.* They are *not established or maintained by the appropriate parties to confer ERISA jurisdiction,* nor is the purpose for their establishment or maintenance appropriate to meet the jurisdictional prerequisites of the Act. They are no more ERISA plans than is any other insurance policy sold to an employee benefit plan.

H.R.Rep. No. 1785, 94th Cong., 2d Sess. 48 (1977) (emphasis added).

The presence and growth of entrepreneurial ventures masquerading as EWBPs has made it necessary for the courts and the Department of Labor to formulate means for distinguishing between employee welfare benefit plans which are established by *bona fide* associations of employers and entrepreneurial ventures established for the purpose of making profit. It is appropriate to review the factors that have been developed to make that distinction and to apply them to the facts in this record.

### 1. Common Economic Or Representation Interest

Numerous courts have made this determination by focusing on whether "the entity that maintains the plan and the individuals that benefit from the plan are tied by a common economic or representation interest, unrelated to the provision of benefits." *Wisconsin Educ. Ass'n Ins. Trust v. Iowa State Bd. of Public Instruction,* 804 F.2d 1059, 1063 (8th Cir.1986). *Accord, MDPhysicians*

*& Assocs. v. State Bd. of Ins.,* 957 F.2d 178, 181–82 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992) (stating agreement with commonality requirement of *Wisconsin Educ. Ass'n); Plog v. Colorado Ass'n of Soil Conservation Districts,* 841 F.Supp. 350, 353 (D.Colo.1993) (requiring cohesive relationship between provider of benefits and recipient of benefits under the plan); *Atlantic Health Care Benefits Trust v. Foster,* 809 F.Supp. 365, 373 (M.D.Pa.1992), *aff'd,* 6 F.3d 778 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994) (must be cohesive bond between employers other than common participation in the plan because entity maintaining plan and those benefitting from plan must be tied by common economic or representation interest); *Baucom v. Pilot Life Ins. Co.,* 674 F.Supp. 1175, 1179–80 (M.D.N.C.1987) (citing commonality requirement described in *Wisconsin Educ. Ass'n* ).

 The clearest examples of this common representation interest are the relationship between employee and employer, *MDPhysicians,* 957 F.2d at 185–86, and between union member and union. *Wisconsin Educ. Ass'n,* 804 F.2d at 1063. The existence of such a common economic or representation interest creates a "protective nexus" in which the employee "can rely on the 'person acting directly as an employer' or the person 'acting indirectly in the interest of' that employer to represent the employee's interests relating to the provision of benefits." *MDPhysicians,* 957 F.2d at 186. It has been recognized that "[t]he representational link between employees and an association of employers *in the same industry* who establish a trust for the benefit of those employees also supplies the requisite connection." *MDPhysicians,* 957 F.2d at 186 (emphasis added), *citing National Business Ass'n Trust v. Morgan,* 770 F.Supp. 1169, 1174–75 (W.D.Ky.1991) (multiple employer trusts established by employers in the bottling and canning industries subject to and governed by ERISA).

 As proof that the IAEA Plan was established and maintained by a *bona fide* association of employers, the plaintiffs rely primarily on the following facts: that the

Association was formed in 1990 by a group of 40 employers who shared dealings with a particular union (Fuller Affidavit, August 5, 1994 ("First Fuller Affidavit"), ¶ 4); that the BRC established the IAEA Trust and Plan (First Fuller Affidavit, ¶ 6); that it did so at approximately the same time that the Local 615 employee benefit plan became insolvent (First Fuller Affidavit, ¶ 6); and that the Association voted to pay the unpaid claims of its members' employees who had been covered by the Local 615 plan (First Fuller Affidavit, ¶ 6). From this, the plaintiffs assert that "the IAEA Trust *was established* by the IAEA Association, an association of approximately 40 employers that were parties to a collective bargaining agreement with United Labor Council Local Union 615." (Plaintiffs' Supplemental Mem., pp. 6–7) (emphasis added). On this basis, plaintiffs assert that "the IAEA Plan both *was established and is maintained by a group or association of employers*, and as such meets the definition of employee welfare benefit plan prescribed by ERISA (29 U.S.C. § 1002(1))." (Plaintiff's Supplemental Mem., p. 7) (emphasis added). The facts cited are insufficient to support the conclusion that there is a common economic or representation interest.

At the outset, it is important to remember that the court is concerned with the IAEA Association's status in a limited time frame. As defined by the plain language of ERISA, a plan's status as an EWBP hinges on whether it was "established or maintained by an employer...." 29 U.S.C. § 1002(1). The IAEA Plan was established in December of 1992 and maintained thereafter. Therefore, the pertinent inquiry is whether the IAEA Association was a *bona fide* association of employers as of December, 1992 or thereafter. To answer this question affirmatively, the court must find that some commonality existed during this time frame. If commonality existed between the IAEA Association and the employees of the member employers in 1990, when the IAEA Association consisted of 40 employers with common ties to a

union, but not as of December, 1992 or thereafter, then the IAEA Plan is not an EWBP.

Evidence concerning the IAEA Association's status and membership in 1990 is relevant only if this status did not change between 1990 and the time that the IAEA Plan was established. The evidence proves otherwise because it shows that, at some time between 1990 and the present, the IAEA Association has undergone dramatic change. The number of employers participating in the Trust has risen as high as 210 employers in 21 states.[3] IAEA Benefit Trust Executive Summary, (Gales Affidavit, October 17, 1994 ("Second Gales Affidavit"), Exhibit 23). In light of this evidence, the court cannot assume that any commonality which existed in 1990 necessarily existed in December, 1992.

The only commonality that the IAEA Association actively asserts as of December, 1992 and thereafter is that its members are "entrepreneurs who are small business employers, and entrepreneurs who are self-employed, who are interested in and in support of the purposes for which the corporation was organized and which it serves." Bylaws of the International Association of Entrepreneurs of America, Art. II, § 2.01 (Fuller Affidavit, November 3, 1994 ("Second Fuller Affidavit"), Exhibit 1). The tenuous nature of this link is illustrated by the fact that the only question on the membership application even remotely related to commonality simply asks the applicant to check a "yes" or "no" box next to the statement "Yes, I am an Entrepreneur and I support free enterprise." (Second Gales Affidavit, Exhibit 21). As the Trust admitted in a communication with the Commission, "membership in the Association is limited to employers which share common entrepreneurial interests and concerns *regardless of the form in which they do business*." (Complaint, Exhibit F, p. 2) (emphasis added). Thus, the record shows that membership in the IAEA Association requires no commonality other than adherence to the principles of entrepreneurial spirit and free enterprise. Those, of course, are laudable principles, but they do not serve to estab-

---

**3.** Although only employer members may participate in the IAEA Trust, participation is not mandatory. Therefore, as 210 employers participat-

ed in the IAEA Trust, there were at least 210 employer members in the IAEA Association.

lish the kind of commonality envisioned by the law.

Solicitation materials gathered by the SCC suggest that members are solicited in the same way they would be by any entrepreneurial insurance company. For example, the materials include scripted language for use by "locators" when contacting potential members. Locators are instructed to make statements such as "I have some information I need to go over with you in reference to saving you serious money" and "just 10–15 minutes of your time could literally save you thousands of dollars." (Second Gales Affidavit, Exhibit 8). None of these materials provide any instruction to locators that they must locate new members who are in a particular industry or who share any other meaningful commonality. In total, these materials bear far greater resemblance to solicitation for an entrepreneurial insurance venture than to solicitation for membership in a *bona fide* association of employers.

On this record, it cannot be said that plaintiffs have shown that any common economic or representation interest existed in December 1992 or thereafter. Consequently, plaintiffs have failed to show that the IAEA Association was the type of *bona fide* employer association that Congress intended to cover in ERISA.

### 2. Employer Members' Control Over The IAEA Plan

Both the Department of Labor and the courts have taken the position that "employer-members of the group or association that participate in the benefit program must, either directly or indirectly, *exercise control over that program,* both in form and in

*substance* in order to act as a *bona fide* employer group or association with respect to the benefit program." Pension and Welfare Benefits Admin., U.S. Dep't of Labor, Multiple Employer Welfare Arrangements Under the Employee Retirement Income Security Act: A Guide to Federal and State Regulation 9 (1992) (emphasis added).

■ Numerous courts have held accordingly. In *Taggart Corp. v. Life and Health Benefits Admin.*, 617 F.2d 1208 (5th Cir. 1980), *cert. denied,* 450 U.S. 1030, 101 S.Ct. 1739, 68 L.Ed.2d 225 (1981), the United States Court of Appeals for the Fifth Circuit found that the Security Multiple Employers Trust ("SMET"), a provider of group insurance to employers, was neither established nor maintained by an employer, pointing to the fact that no employer "participates in SMET's *day to day* operation or administration." *Id.* at 1210 (emphasis added).[4] In *Plog v. Colorado Ass'n of Soil Conservation Dists.*, 841 F.Supp. 350 (D.Colo.1993), the court held that a "multi-employer plan is not within the ambit of ERISA if employers have no direct involvement in the plan's *day-to-day* operation or administration." *Id.* at 353 (emphasis added). The district court for the Southern District of West Virginia reached precisely the same conclusion. *ELCO Mechanical Contractors, Inc. v. Builders Supply Ass'n of West Virginia*, 832 F.Supp. 1054, 1057 (S.D.W.Va.1993) ("multi-employer plan is not within the ambit of ERISA if employers have no direct involvement in its administration"). In *MDPhysicians & Associates v. State Bd. of Ins.*, 957 F.2d 178 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992), the Fifth Circuit articulated the reasoning behind this line of cases: "To allow an entrepreneurial venture to qual-

---

4. The *Taggart* court also held that an individual employer did not establish an ERISA-covered benefit plan by subscribing to SMET because ERISA does not regulate "bare purchases of health insurance." *Taggart,* 617 F.2d at 1211. This part of the *Taggart* decision has been criticized and limited both within and outside of the Fourth Circuit. *See Madonia v. Blue Cross & Blue Shield of Virginia,* 11 F.3d 444, 447 (4th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1401, 128 L.Ed.2d 74 (1994); *Custer v. Pan American Life Ins. Co.,* 12 F.3d 410, 418 (4th Cir.1993); *Fugarino v. Hartford Life and Accident Ins. Co.,* 969 F.2d 178, 184–85 (6th Cir.1992),

*cert. denied,* —— U.S. ——, 113 S.Ct. 1401, 122 L.Ed.2d 774 (1993); *Donovan v. Dillingham,* 688 F.2d 1367, 1375 (11th Cir.1982). However, the issue of whether an employer establishes an ERISA-covered benefit plan by purchasing insurance is legally distinct from the pertinent issue in this case, which is whether an entity such as SMET or the IAEA Trust and IAEA Plan is established or maintained "by the appropriate parties to confer ERISA jurisdiction." *Taggart,* 617 F.2d at 1210. This court relies on *Taggart* only for its guidance as to the circumstances under which a multi-employer entity constitutes an EWBP. On that point, *Taggart* remains persuasive authority.

ify as an 'employer' by establishing and maintaining a multiple employer welfare arrangement without input by the employers who subscribe to the plan would twist the language of the statute and defeat the purposes of Congress." *Id.* at 185.[5]

■ The plaintiffs argue that the employer participation requirement is satisfied in the present case because "ultimate control of the IAEA Trust and Plan is maintained by a Benefits Review Committee elected by the participating employer members of the IAEA Association." (Plaintiffs' Supplemental Mem., p. 7). The evidence in the record, however, fails to demonstrate that employer members of the IAEA Association "either directly or indirectly, *exercise control over that program, both in form and in substance.*" Pension and Welfare Benefits Admin., U.S. Dep't of Labor, Multiple Employer Welfare Arrangements Under the Employee Retirement Income Security Act: A Guide to Federal and State Regulation 9 (1992) (emphasis added).

Although the IAEA Association apparently has nominal, indirect control over the IAEA Trust and the IAEA Plan through the BRC, that alone is not proof that employer members *exercise actual control* over the Plan *both in form and in substance.* Indeed, the evidence strongly suggests it is Mr. Fuller, and perhaps his employees or agents, that actually control the administration of the Plan. Fuller serves as Trustee "during the continuation of this Trust, until death, incapacity, dissolution, resignation, or removal as any of the same shall apply." Restatement of Agreement and Declaration of Trust, p. 11 (Complaint, Exhibit A). Although Fuller may be removed "for cause at any time by the BRC," Restatement of Agreement and

Declaration of Trust, p. 11 (Complaint, Exhibit A), he is one of three members of the BRC. More significantly, Fuller is also the "interim Administrator" of the IAEA Plan, (Second Gales Affidavit, Exhibit 23); and, according to the Restatement of Agreement and Declaration of Trust, the BRC may by agreement "confer upon the Administrator any power, duty or responsibility conferred upon the BRC pursuant to this agreement." Restatement of Agreement and Declaration of Trust, p. 22 (Complaint, Exhibit A). The Restatement of Agreement and Declaration of Trust provides that the BRC may delegate "general and complete managerial authority over the day to day affairs of the Trust and any Employee Welfare Benefit Plan established pursuant to this Trust." Restatement of Agreement and Declaration of Trust, p. 22 (Complaint, Exhibit A). In other words, the IAEA Trust and the IAEA Plan were established such that virtually all control of the Plan can rest in one man.

That is particularly significant where, as here, the plaintiffs have failed to provide evidence that members of the IAEA Association who participate in the Trust *actually play some role* in the Trust's administration, or that they were ever intended to play such a role. Virtually all of the plaintiffs' evidence goes to the form and appearance of the Trust and Plan. However, there is no evidence from which the court can discern the role actually played by employer members in establishing or maintaining the IAEA Plan. The evidence in the record is insufficient to show that the IAEA Trust and the IAEA Plan are anything other than an entrepreneurial insurance venture established for making a profit in the sale of insurance prod-

---

5. These decisions are susceptible to one significant criticism. ERISA's plain language requires that an EWBP be "established or maintained" by an employer or an employee organization, or both. To the extent that these cases hold that a MEWA that was *established* by a *bona fide* association of employers is not an EWBP because the employer members do not participate in the *maintenance* of the plan, they would seem to run counter to the statute's plain language. *See National Business Ass'n v. Morgan,* 770 F.Supp. 1169, 1175 (W.D.Ky.1991) (plan not maintained by group of employers still an EWBP because established by group of employers). This does

not mean, however, that those decisions are not instructive to the court. First, if a plan purports to be maintained by a *bona fide* association of employers and was not established by the same, a court must consider the role that employer members play in the plan's administration. Second, when looking at the establishment of a plan, a court must consider whether it was established in such a way as to involve the employer members in the administration of the plan. This will guide the court when it decides whether the entity establishing it was a *bona fide* association such as Congress intended to be covered by ERISA.

ucts under structural arrangements intended to effect an escape from state regulation.

### 3. Criteria Used By The Department Of Labor

 Lastly, the Department of Labor has articulated six factors by which to evaluate whether a purported association is in fact a *bona fide* association of employers within the meaning of ERISA:

(1) how members are solicited;

(2) who is entitled to participate and who actually participates in the association;

(3) the process by which the association was formed;

(4) the purposes for which it was formed and what, if any, were the preexisting relationships of its members;

(5) the powers, rights, and privileges of employer-members; and

(6) who actually controls and directs the activities and operations of the benefit program.

Pension and Welfare Benefits Admin., U.S. Dep't of Labor, Multiple Employer Welfare Arrangements Under the Employee Retirement Income Security Act: A Guide to Federal and State Regulation 9 (1992). The Department of Labor's construction of ERISA is entitled to a substantial measure of deference. *Otto v. Variable Annuity Life Ins. Co.*, 814 F.2d 1127, 1135 (7th Cir.1986), *cert. denied,* 486 U.S. 1026, 108 S.Ct. 2004, 100 L.Ed.2d 235 (1988); *Griggs v. Duke Power Co.,* 401 U.S. 424, 433–34, 91 S.Ct. 849, 854–55, 28 L.Ed.2d 158 (1971) (administrative interpretation of an act by enforcing agency is entitled to great deference); *Abella v. W.A. Foote Memorial Hosp., Inc.,* 740 F.2d 4, 5 (6th Cir.1984) ("the administrative interpretation of a statute by those entrusted with its enforcement is entitled to great weight.") *Equal Employment Opportunity Commission v. Hansa Products, Inc.,* 844 F.2d 191, 195 (4th Cir.1988).

 Application of these criteria further indicates that the IAEA Plan is not an EWBP established or maintained by a *bona fide* association of employers. First, the weight of the evidence suggests that members are solicited by "locators," often licensed agents, who use solicitation materials very much similar to those that would be used by any commercial insurance venture. The solicitation is essentially indiscriminate and not focused on any particular type of employer or entrepreneur. Second, membership in the association appears to be open to any employer considering himself an entrepreneur. The evidence is scarce as to who actually participates in the association, but it appears to be open to all comers who share the entrepreneurial spirit, excluding only that rare breed of business owner who does not consider himself an entrepreneur. Third, although the IAEA Association was formed as a Texas non-profit association in 1990 by approximately 40 employers having dealt with Local 615, the evidence is not clear about the make-up of the membership as of December 1992, when the IAEA Association incorporated. Fourth, it is agreed that the purpose for forming the IAEA Association was that the founding employers "became concerned about the operation and administration of the union's health and welfare benefit plan and established the Association to deal with these concerns *and their common entrepreneurial interests* " (Complaint, Exhibit F) (emphasis added). The record, however, is silent on why the IAEA Association incorporated in December of 1992, the same time that it established the IAEA Trust and Plan. Fifth, the IAEA Association's employer members ultimately control and elect the BRC. But, sixth and finally, the evidence does not prove that the IAEA Association's employer members actually exercise that control, or that anyone other than Mr. Fuller and his staff plays any active role in the administration of the IAEA Plan.

 For the foregoing reasons, the plaintiffs have failed to prove that the IAEA Plan is an ERISA-covered EWBP. As a result, the SCC may regulate the IAEA Benefit Trust as it would any other insurance provider. Furthermore, because the court finds that the IAEA Plan is not an ERISA covered EWBP, it rejects the plaintiffs' argument that the SCC lacks jurisdiction under Va. Code § 38.2–3420 to regulate the IAEA Trust in its offering and providing of employee benefits.

## B. ERISA PREEMPTION

■ Ordinarily, it is preferable to articulate a single basis for decision and, conversely, to refrain from making alternative holdings. *Karsten v. Kaiser Found. Health Plan of the Mid–Atlantic States, Inc.*, 36 F.3d 8, 11 (4th Cir.1994). However, because this action involves a factual record that affects not only the ERISA coverage issue but also the related preemption issue, this action presents one of those unusual circumstances where it is appropriate to articulate an alternative ground of decision. Accordingly, the court will now consider whether the relief sought by the plaintiffs would be appropriate if the IAEA Plan were an ERISA-covered EWBP.

### 1. ERISA's Statutory Provisions

■ Whether the preemption provisions of ERISA preclude application of state law to an ERISA-covered MEWA is governed by the interplay of four clauses within ERISA: (i) the Pre-emption Clause; (ii) the Savings Clause; (iii) the Deemer Clause; and (iv) the MEWA Clause.

■ The "Preemption Clause" provides that ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a). The Preemption Clause is "conspicuous for its breadth," *FMC Corp. v. Holliday*, 498 U.S. 52, 58, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990), and "reflects the intent of Congress to create a comprehensive national scheme for the regulation of employee welfare benefit plans." *Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1, 4 (2nd Cir.1993), *cert. denied*, — U.S. —, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994).

■ Notwithstanding the breadth of the Preemption Clause, Congress did not intend to take from the states their ability to regulate the insurance industry. Therefore, Congress included the "Savings Clause" which provides that "nothing in this subchapter shall be construed to exempt or relieve any person from any law of any state which regulates insurance." 29 U.S.C. § 1144(b)(2)(A).

■ Then, to prevent the states from escaping ERISA preemption by simply deeming ERISA covered plans to be within the insurance industry, Congress included the "Deemer Clause." It provides that neither an EWBP nor a trust created under such a plan "shall be deemed to be an insurance company ... or to be engaged in the business of insurance ... for purposes of any law of any State purporting to regulate insurance companies [or] insurance contracts." 29 U.S.C. § 1144(b)(2)(B).

■ Finally, in 1983, Congress amended ERISA to add one further limitation to ERISA's pre-emptive scope by making clear that states could regulate MEWAs. The "MEWA Clause" provides:

(6)(A) Notwithstanding any other provision of this section—

(i) in the case of an employee welfare benefit plan which is a multiple employer welfare arrangement and is fully insured (or which is a multiple employer welfare arrangement subject to an exemption under subparagraph (B)), any law of any State which regulates insurance may apply to such arrangement to the extent that such law provides—

(I) standards, requiring the maintenance of specified levels of reserves and specified levels of contributions, which any such plan, or any trust established under such a plan, must meet in order to be considered under such law able to pay benefits in full when due, and

(II) provisions to enforce such standards, and

(ii) in the case of any other employee welfare benefit plan which is a multiple employer welfare arrangement, in addition to this subchapter, any law of any State which regulates insurance may apply to the extent not inconsistent with the preceding sections of this subchapter.

29 U.S.C. § 1144(b)(6)(A).

### 2. Applicability of ERISA Pre-emption In This Action

Pursuant to the MEWA Clause, where the subject of regulation is an ERISA-covered MEWA that is not fully insured, "any law of

any state *which regulates insurance* may apply *to the extent not inconsistent with the preceding sections of this subchapter.*" 29 U.S.C. § 1144(b)(6)(A)(ii). Therefore, the two pertinent inquiries are whether the law in question regulates insurance and whether application of that law is inconsistent with ERISA.

### a. *Regulation Of The Business Of Insurance*

■■■ The phrase "regulates insurance," which Congress included in both the Savings Clause and the MEWA Clause, includes "only those state insurance laws that regulate the 'business of insurance.'" *Powell v. Chesapeake & Potomac Telephone Co. of Virginia,* 780 F.2d 419, 423 (4th Cir.1985), *cert. denied,* 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986). ERISA's "regulates insurance" language has been interpreted as co-extensive with the phrase "business of insurance" in the McCarran–Ferguson Act. *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 742–44, 105 S.Ct. 2380, 2390–91, 85 L.Ed.2d 728 (1985); *Tri–State Mach., Inc. v. Nationwide Life Ins. Co.,* 33 F.3d 309, 312 (4th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1175, 130 L.Ed.2d 1128 (1995); *Powell,* 780 F.2d at 423.

The Supreme Court has articulated the analysis through which a court must proceed to determine whether a particular state law "regulates insurance" within the meaning of ERISA. In *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 105 S.Ct. 2380, 85 L.Ed.2d 728 (1985), the Court followed a two-pronged approach. First, the Court took a "common sense view" of whether the law in question regulated insurance. *Id.* at 740, 105 S.Ct. at 2389. Second, the court applied case law interpreting the phrase "business of insurance" in the McCarran–Ferguson Act to the law at issue. *Id.* at 742, 105 S.Ct. at 2390–91. The McCarran–Ferguson Act cases identified three criteria relevant to the determination of what falls within the "business of insurance:"

> *[F]irst,* whether the practice has the effect of transferring or spreading a policyholder's risk; *second,* whether the practice is an integral part of the policy relationship between the insurer and the insured; and *third,* whether the practice is limited to entities within the insurance industry.

*Id.* at 743, 105 S.Ct. at 2391, *citing United Labor Life Ins. Co. v. Pireno,* 458 U.S. 119, 129, 102 S.Ct. 3002, 3008–09, 73 L.Ed.2d 647 (1982).

While the McCarran–Ferguson Act factors speak to the nature of the "practice" that is regulated, the Supreme Court has made clear that a court must apply these factors to the challenged law itself, asking first whether common sense dictates that the law is one that regulates insurance and second whether the challenged law has the effect of spreading risk, whether it is integral to the policy relationship, and whether it is specifically limited to the insurance industry. *Pilot Life Ins. Co. v. Dedeaux,* 481 U.S. 41, 50–51, 107 S.Ct. 1549, 1554, 95 L.Ed.2d 39 (1987).

■■■ The court has found no decision applying the foregoing analysis to a state law requiring an ERISA-covered MEWA to become licensed. The SCC points to decisions which hold that requiring a MEWA to obtain a license is not inconsistent with ERISA. *See MDPhysicians & Assocs., Inc. v. Wrotenbery,* 762 F.Supp. 695, 699 (N.D.Tex.1991), *aff'd,* 957 F.2d 178 (5th Cir.), *cert. denied,* — U.S. —, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992); *Atlantic Health Care Benefits Trust v. Foster,* 809 F.Supp. 365, 374 (M.D.Pa.1992), *aff'd,* 6 F.3d 778 (3rd Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994). That, however, is a legal issue separate and distinct from whether a licensing requirement is a law regulating insurance within the meaning of the MEWA clause. Consequently, the court must venture into unchartered waters and apply the *Metropolitan Life* analysis to the licensing requirement at issue in this case.

Applying first the "common sense view" directed by *Metropolitan Life,* the court views Regulation 31 and its application to the IAEA Plan as the first step in regulating the IAEA Plan in its conduct of the business of insurance. Simply put, the MEWA Clause expressly authorizes the application of all laws regulating insurance to an ERISA-cov-

ered MEWA that is not fully insured. Regulation 31 is the mechanism by which the SCC applies the Virginia's insurance laws to the IAEA Plan and monitors the IAEA Trust's compliance therewith. From a common sense perspective, this is fundamentally the regulation of the business of insurance.

Plaintiffs' contention that the "requirement for licensure is not a regulation of the transaction of insurance," (Plaintiffs' Supplemental Mem., p. 12), runs counter to both reason and experience. Licensing is the fundamental tool that governments use to monitor the "transaction" of any activity, be it operating an automobile, selling insurance products, or practicing law. Regulation 31 is the licensing requirement used by the SCC to license companies transacting insurance in Virginia.

Turning to the second prong of the *Metropolitan Life* analysis, the court applies to the challenged law those factors articulated by courts interpreting the "business of insurance" language of the McCarran–Ferguson Act. First, the court finds that licensing and the administrative monitoring that accompanies such licensing has the effect of transferring or spreading a policyholder's risk. When an administrative body directly monitors the economic health of a plan, and requires compliance with requirements affecting issues such as reserves or contributions or the permissible terms of an insurance contract, this has a direct and significant impact on the risk borne by the respective parties. The plaintiffs' argument that "the requirement that a MEWA that is not fully insured be licensed as an insurance company has nothing to do with the transferring or spreading of a policyholder's risk," (Plaintiffs' Mem. in Opposition to Motion to Dismiss, p. 15), is to no avail. Licensure is the means by which the state effects compliance with all of its requirements concerning the transferring

and spreading of risk, and as such it has much to do with that subject.

Second, licensing is integral to the relationship between the insurer and insured. The reasoning here is similar to that under the first prong. Licensing is the mechanism by which the state exercises control over the relationship between insurer and insured. When an insurance company is licensed, the state is better able to monitor and regulate the insurer's relationship with the insured.

Third, the court finds that the laws at issue in this action are limited to entities within the insurance industry. The court recognizes that Regulation 31 is, on its face, directed at all MEWAS, and it contemplates licensing "as an insurance company, health maintenance organization, health services plan, or a dental or optometric services plan." Regulation 31, § 5(A). However, this law is not one of general applicability that just happens to be applied to insurance providers. Nor is it a law that developed from general principles of some other area of law, such as tort or contract. *See Pilot Life Ins. Co. v. DeDeaux*, 481 U.S. 41, 51, 107 S.Ct. 1549, 1554–55, 95 L.Ed.2d 39 (1987). Rather, this law requires that MEWAs be licensed so that the state can regulate their conduct of the business of insurance, subject of course to those limitations expressly imposed by ERISA's MEWA Clause. Until the SCC uses its licensure process to enforce against an ERISA-covered MEWA a law that is not limited to the insurance industry, this court cannot hold that the licensing requirement fails under this third element of the "business of insurance" test.

Based on the *Metropolitan Life* analysis, the court concludes that the laws at issue in this action regulate insurance within the meaning of ERISA and are not preempted.[6]

---

6. In *Securities and Exchange Commission, Inc. v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), the Supreme Court held:

> The relationship between insurer and insured, the type of policy which could be issued, its reliability, interpretation, and enforcement— these were the core of the 'business of insurance.' Undoubtedly, other activities of insurance companies relate so closely to their status

as reliable insurers that they [too] must be placed in the same class. But whatever the exact scope of the statutory term, it is clear where the focus was—it was on the relationship between the insurance company and the policyholder. Statutes aimed at protecting or regulating this relationship, *directly or indirectly* are laws regulating the 'business of insurance.'

*Id.* at 460, 89 S.Ct. at 568–69. Even if it does so indirectly, the licensing requirement here at issue

The Department of Labor reached this same conclusion, stating:

> [I]t is the view of the Department that it would be contrary to Congressional intent to conclude that states, while having the authority to apply insurance laws to such plans, do not have the authority to require and enforce registration, licensing, reporting, and similar requirements necessary to establish and monitor compliance with those laws.

United States Department of Labor, Pension and Welfare Benefits Administration, Advisory Opinion 90–18A, p. 4 (Second Gales Affidavit, Exhibit 1).

The Department of Labor's position highlights the greatest difficulty in the result advocated by the plaintiffs. The plaintiffs admit, as they must, that "Virginia could apply to the IAEA Trust and the IAEA Plan or any other MEWA a law that regulates insurance and that is consistent with ERISA," (Plaintiffs' Mem. in Opposition to Motion to Dismiss, p. 17), yet they contend that Virginia has not done so "in attempting to apply Virginia Code § 38.2–3420 and Insurance Regulation No. 31" to the IAEA Trust and the IAEA Plan. (Plaintiffs' Mem. in Opposition to Motion to Dismiss, p. 17). This argument, of necessity, amounts to the following: Congress intended that state laws regulating the business of insurance that are not inconsistent with ERISA would not be preempted by ERISA, but that the licensing requirements by which such laws are implemented and enforced would be preempted. Like the Department of Labor, the court finds this argument unpersuasive.

The necessary result of the approach espoused by the plaintiffs is that, while a state may apply to MEWAs laws regulating insurance, it must establish a separate and independent scheme of regulation to do so. The Second Circuit recently addressed precisely this argument in *Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1 (2nd Cir.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994). In that case, plaintiffs argued that "even if the MEWA clause does permit a state to regulate self funded MEWAs, a state cannot do so simply by designating MEWAs as insurance companies subject to the existing framework of insurance regulation." *Id.* at 5. As the Second Circuit summarized this argument, a state wishing to regulate a MEWA must "create a separate MEWA scheme of regulation." *Id.*

The Second Circuit rejected this argument, holding that:

> The MEWA clause specifically states that "any law of any state which regulates insurance may apply [to a MEWA] to the extent not inconsistent with the preceding sections of this title." Under the plain language of this clause *and subject to the limitations stated therein*, Connecticut may regulate Atlantic under its insurance code.

*Id.* (emphasis added).

The Second Circuit's reasoning is compelling. The plain language of the MEWA clause permits the application of existing laws regulating insurance to MEWAs. Congress gave absolutely no indication that a state wishing to regulate ERISA-covered MEWAs must create a separate regulatory scheme to do so.

The MEWA Clause includes limitations on a state's power to regulate ERISA-covered MEWAs. Only laws that regulate insurance may be applied to ERISA-covered MEWAs, and even then only to the extent not inconsistent with ERISA. However, the Second Circuit persuasively reasoned that a state may carry out its regulation of ERISA-covered MEWAS under its existing insurance code, subject to the limitations described above. Therefore, the plaintiffs' argument that " 'laws which regulate insurance' are not coterminous with a state's entire insurance code or even laws that regulate insurance companies," (Plaintiffs' Supplemental Mem., p. 4), does not require the conclusion that a separate scheme must be developed for the regulation of MEWAs. The court acknowledges that not all laws included in a state's insurance code are necessarily laws regulating the business of insurance. *See Tri–State Machine, Inc. v. Nationwide Life Ins. Co.*, 33 F.3d 309, 314 (4th Cir1994), *cert. denied*, ——

regulates the business of insurance and thus is not preempted by ERISA.

U.S. ——, 115 S.Ct. 1175, 130 L.Ed.2d 1128 (1995); *Custer v. Pan American Life Ins. Co.*, 12 F.3d 410, 419–20 (4th Cir.1993). The state may not apply to an ERISA-covered MEWA laws that do not regulate the business of insurance. What it may do, however, is require such a MEWA to become licensed, and then apply its insurance code to those MEWAs subject to the express limitations of the MEWA Clause.

### b. *Inconsistency With ERISA*

■ The second limitation on state regulation of ERISA-covered MEWAs that are not fully insured is that such regulation must not be inconsistent with ERISA. 29 U.S.C. § 1144(b)(2)(B). The Department of Labor has directly addressed this issue and concluded that licensing requirements are not inconsistent with ERISA. It stated:

> [I]t is the opinion of the Department that a state law regulating insurance which *requires the obtaining of a license or certificate of authority as a condition precedent* or otherwise to transacting insurance business *or which subjects persons who fail to comply with such requirements to taxation, fines, and other civil penalties,* including injunctive relief, *would not in and of itself adversely affect the protections and safeguards Congress intended* to be available to participants and beneficiaries or conflict with any provision of Title I of ERISA, and, *therefore, would not,* for purposes of section 514(b)(6)(A)(ii), *be inconsistent* with the provisions of title I.

United States Department of Labor, Pension and Welfare Benefits Administration, Advisory Opinion 90–18A, p. 4 (Second Gales Affidavit, Exhibit 1) (emphasis added). Several courts also have held that licensing of an ERISA-covered MEWA is not inconsistent with ERISA. *MDPhysicians & Assocs., Inc. v. Wrotenbery,* 762 F.Supp. 695, 699 (N.D.Tex.1991), *aff'd,* 957 F.2d 178 (5th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 179, 121 L.Ed.2d 125 (1992); *Atlantic Health Care Benefits Trust v. Foster,* 809 F.Supp. 365, 374 (M.D.Pa.1992), *aff'd,* 6 F.3d 778 (3rd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994).

Plaintiffs contend that application of the licensing requirement in Regulation 31 to the IAEA Trust and the IAEA Plan is inconsistent with ERISA because it will effectively preclude the IAEA Trust from operating in Virginia. (Plaintiff's Supplemental Mem., p. 14). The plaintiffs argue that, because they purport to be an ERISA-covered MEWA rather than an insurance company, they would be unable to comply with several of the Commission's requirements for foreign and alien insurance companies seeking to do business in Virginia. For example, the plaintiffs contend that the IAEA Trust "does not have financial statements prepared on standard size NAIC forms, it is not the subject of Reports on Examination certified by any insurance commissioner, and it cannot obtain a certificate of compliance as an insurer issued by the Insurance Commission of Wisconsin." (Plaintiff's Supplemental Mem., p. 14); (Second Fuller Affidavit, Exhibit 2). The plaintiffs say that the IAEA Trust's inability to comply with these requirements would preclude its operation in Virginia, which would be inconsistent with ERISA.

When confronted with this issue at the December 2 hearing on the Motion to Dismiss, counsel for the SCC responded that the IAEA Trust could in fact comply with some of these requirements, such as filling out an NAIC form; but he recognized that if requirements existed with which the IAEA Trust could not comply, such as a report or examination, the SCC could not deny licensure on that basis. Instead, the SCC would be required to find some way to accommodate the Trust.

The mere requirement that the IAEA Trust become licensed in Virginia is not inconsistent with ERISA. The licensing requirement is entirely consistent with ERISA so long as the SCC accomodates an ERISA-covered MEWA where necessary to permit its operation in Virginia. For example, if such a plan does not have financial statements prepared on standard size NAIC forms or Reports on Examination certified by insurance commissioner, the SCC could either accept an answer of "not applicable" or work out some alternative way to get the desired information.

The Second Circuit sanctioned precisely that approach to the problem in *Atlantic Healthcare Benefits Trust v. Googins*, 2 F.3d 1 (2nd Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 689, 126 L.Ed.2d 656 (1994), in which the state commission required a certificate of incorporation or charter that certain MEWAS could not provide. The Second Circuit held that the licensing requirement was not inconsistent with ERISA, commenting that: "True, Conn Gen.Stat. 38a–41(a) requires that applicants file their certificates of incorporation or charters; but that section does not state that insurance companies that are not incorporated must do so, or that the commissioner will not accept 'not applicable' for an answer." *Id.* at 6.

That approach is rational and consistent with ERISA and it provides instruction respecting how to proceed here. If the SCC chooses to regulate ERISA-covered MEWAs in their conduct of the business of insurance and to do so by utilizing the same licensing procedure that it applies to insurance companies, it must accommodate the basic differences between those two types of entities. Only if the SCC refuses to do so will it have acted in a manner inconsistent with ERISA. Contrary to the plaintiffs' argument, the mere fact that application of a licensing statute to an ERISA-covered MEWA would require some accommodation of the different structure of those plans does not make that requirement inconsistent with ERISA.

The decision in *Fuller v. Stenberg,* No. 8:cv93–00407, slip op. (D. Neb. May 25, 1994) does not require a different result. There, as here, the IAEA Trust argued that state regulation was preempted by ERISA. *Id.* at 5. The plaintiffs argued, as they do here, that the net effect of the state regulatory scheme was to preclude the IAEA Plan, a MEWA permitted under ERISA, from operating in the state and that this effect was inconsistent with ERISA. *Id.* at 13–14.

On a Rule 12(b)(6) motion to dismiss, the court held that the plaintiffs had stated a valid claim for relief. *Id.* at 14. Although the court in *Stenberg* recognized that "ERISA provides wide latitude for states to regulate MEWAs as insurance companies," it correctly observed that "state regulation of MEWAs is permitted only as long as the regulations are not inconsistent with ERISA." *Id.* The court held: "A state insurance scheme that effectively prohibits a MEWA from operating is 'inconsistent with' ERISA and is therefore preempted by ERISA." *Id.*

The *Stenberg* court did not hold that the challenged regulatory scheme was in fact inconsistent with ERISA. Rather, it held that such a scheme *could be* inconsistent with ERISA if the evidence proved that the regulatory scheme effectively prohibited ERISA-covered MEWAs from operating within the state. This court does not dispute *Stenberg's* holding, but rather it finds that the plaintiffs have not proven that they will be unable to become licensed in Virginia or precluded from operating here. The SCC has represented that, to the extent the IAEA Trust would be unable to comply with any of the requirements of licensing because of status as an EISA-covered MEWA, the SCC will accommodate the IAEA Trust and not deny it a license on the basis of that inability alone. On this record, the court finds that the application of Regulation 31 to the IAEA Trust is not, in and of itself, inconsistent with ERISA.

Hence, even if the IAEA Plan were an ERISA-covered EWBP, ERISA would not preempt application of Regulation 31 to the IAEA Plan. Finding no federal preemption, the court declines to exercise jurisdiction over the state law question of whether the Commissioner has jurisdiction under Va. Code § 38.2–3420 to regulate the IAEA Trust and Plan.

## CONCLUSION

For the reasons stated herein, the judgment on the merits shall be entered in favor of the defendants and the action shall be dismissed with prejudice.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.