479 S.E.2d 290

**Shohn E. KREPPS, by his Guardian ad Litem, Patsy C. KREPPS, Appellant,**

v.

**Kent Robert AUSEN, Respondent.**

**No. 2587.**

Court of Appeals of South Carolina.

Submitted Oct. 8, 1996.

Decided Nov. 4, 1996.

---

598

William H. Godbold, III, Rock Hill; and Charles G. Monnett, III, Charlotte, for appellant.

Thomas A. McKinney and James W. Tucker, Jr., both of McKinney, Givens & Millar, Rock Hill, for respondent.

ANDERSON, Judge:

Shohn E. Krepps, through his Guardian ad Litem, Patsy C. Krepps, brought this action seeking damages for personal injuries sustained as a result of an automobile accident. In a separate action filed simultaneously with the present case, Patsy Krepps individually sought reimbursement for medical expenses incurred by Shohn.

The two cases were tried together. In the action brought by Patsy Krepps for reimbursement of Shohn's medical expenses, the jury returned a verdict in the amount of $23,081.81 actual damages. However, in the case under appeal brought by Patsy Krepps as Guardian ad Litem for Shohn, the jury returned a verdict for zero dollars actual and punitive damages. Krepps then moved for judgment notwithstanding the verdict or alternatively for a new trial absolute, or alternatively for new trial *nisi additur*. These motions were based on the inconsistency in the two verdicts returned by the jury.[1] The trial court granted the new trial *nisi additur* motion in the amount of $7500. The trial court further denied Krepps's subsequent motion to alter or amend judgment. Krepps appeals the trial court's denial of his motion for new trial absolute. We reverse and remand for a new trial.[2]

## FACTS/PROCEDURAL BACKGROUND

On October 2, 1988, around 2:00 a.m., Shohn Krepps (Shohn), then twelve years old, was riding in a Ford Bronco being driven by his grandmother, Ruth Brandon. In addition to Shohn and his grandmother, Shohn's grandfather, Robert Brandon, and two of Shohn's cousins were also riding in the vehicle. They were traveling on Interstate 85 to Spartanburg,

1. There is no appeal in the companion medical reimbursement case.

2. Because oral argument would not aid the court in resolving the issues, we decide this case without oral argument.

South Carolina. The Brandons laid the back seat of the Bronco down so that Shohn and his two cousins could sleep. Ruth Brandon was driving approximately fifty miles per hour when the Bronco was struck from behind by an automobile driven by Kent Robert Ausen (Ausen).

The Bronco crossed the median and the southbound lanes of Interstate 85, went down an embankment, and struck a tree. As a result, the Bronco was severely damaged and was later declared a total loss.

On the night of the accident, Ausen had been drinking beer and liquor in the VIP lounge from approximately 7:30 p.m. to 1:30 a.m. He drank at least six beers and one shot of liquor before leaving the lounge.

In his answer, Ausen admitted "simple negligence on his part." Ausen accepted "responsibility for this accident" and considered the accident to be his fault. He described the damage to the Bronco as "excessive," "extensive," and "major." He further conceded the impact between the two vehicles was "substantial."

Trooper J.M. Brown, a South Carolina Highway Patrol Officer, arrived at the scene shortly after the accident. He observed Ausen's pants "unzipped and kind of hanging on him." He testified Ausen was disoriented, smelled of alcohol, and did not know his passenger's name. Trooper Brown opined Ausen was under the influence of alcohol at the time of the wreck.

Trooper Brown heard the children in the Bronco crying loudly at the accident scene. He also observed Robert Brandon bleeding heavily from his arm. Trooper Brown noticed all of the windows had broken out of the Bronco and that there was some blood down the sides of the vehicle. During his investigation of the accident, Trooper Brown never talked to Shohn.

In the accident, Shohn's head struck the top of the Bronco. His head began hurting immediately after the accident. While at the scene, Shohn told his grandfather he was "seeing stars." Shohn further told him "if your head hit the top of the Bronco like mine did, you would cry too."

Shohn continued to complain of a headache while in the emergency room. When Joey Childers, Shohn's uncle, visited Shohn at the hospital, Shohn was "crying and complaining with a headache." Robert Brandon and Joey Childers both testified they did not observe any head injury suffered by Shohn as a result of the accident. Ruth Brandon, Shohn's grandmother, also saw no injury, bump, or bruise on Shohn's head. Shohn was released from the hospital later that same day at the same time all of the other passengers in the Bronco were released.

On the night of October 2, 1988, Shohn "couldn't stand the noise from the TV" and "would just hold [the back part of] his head and cry." He could not sleep that night. The next day, because Shohn continued to complain of a headache, Shohn's mother took him to Dr. Crotwell, a family practitioner. The doctor examined Shohn, but did not prescribe any medication or send him to another doctor. Because his headaches persisted, Shohn returned to Dr. Crotwell approximately one week later. At Shohn's mother's request, Dr. Crotwell referred Shohn to Dr. Philip S. Lesser, a pediatric neurologist.

Dr. Lesser first examined Shohn on November 2, 1988, approximately one month after the wreck. He did not review any medical or school records before evaluating Shohn. Dr. Lesser stated he was able to determine the cause of Shohn's complaints based upon a history provided mainly by Shohn and his mother. Such history included information indicating Shohn had lost consciousness as a result of the accident. However, there was no testimony Shohn ever lost consciousness. Shohn's mother informed Dr. Lesser that Shohn had developed severe headaches, blurred vision, and numbness of the scalp. She further stated Shohn had been irritable, moody, sad, easily upset, tearful, depressed, and unable to do his school work.

Dr. Lesser diagnosed Shohn as having postconcussive syndrome. Yet, he admitted the results of all of his examinations were in the normal range. He then referred Shohn to a neuropsychologist, Dr. Tarras Onischenko, for further evaluation and testing.

On January 17, 1990, Shohn returned to Dr. Lesser, who conducted physical and neurological exams on Shohn. Dr.

Lesser testified the exams were "completely unremarkable." When Dr. Lesser again saw Shohn on October 17, 1990, Shohn and his mother told him Shohn was attending school half-days, taking four subjects, and making B's and C's in a standard ninth grade class. Dr. Lesser stated Shohn showed mild improvement since the January 1990 visit. He further indicated that by the October visit, Shohn's headaches were "considerably better" and "did not continue to be a very significant issue."

At Shohn's second visit to Dr. Lesser, approximately fourteen months after the first visit, Shohn's mother told Dr. Lesser Shohn was "still having a lot of difficulty in school." She then testified Shohn was not in school during the entire fourteen month period. Shohn was in the seventh grade when the wreck occurred and approximately two years later he was in the ninth grade.

Dr. Lesser testified it was possible for the brain to be injured without any damage to the skull or any bleeding inside the skull. He stated that closed head injuries often result in postconcussive syndrome, which is evidenced by physical symptoms such as personality change, drop in school performance, headache, fatigue, sleep disturbance, mood alteration, irritability, and memory loss. Dr. Lesser further indicated it was possible for a person to sustain a closed head injury, or postconcussive syndrome, and have little pain, very few complaints, a normal neurologic exam, a normal MRI, and a normal CAT scan. He was "ninety-nine percent" certain that Shohn sustained a closed head injury.

Dr. Lesser stated that in his opinion Shohn's brain injury was due to the closed head injury he suffered in the accident which occurred in October of 1988. He further stated he anticipated the injury to be permanent.

Dr. Tarras Onischenko first saw Shohn on November 21, 1988. Before evaluating Shohn, Dr. Onischenko took a history from Shohn and his mother and relied on their statements as to whatever changes occurred in Shohn's behavior. He did not talk with any of Shohn's teachers, any other medical doctors, any emergency room staff, or anyone other than Shohn and his mother. He further did not review any of Shohn's medical records other than one letter from Dr. Less-

er. Moreover, Dr. Onischenko was under the impression that Shohn had been unconscious for approximately ten minutes as a result of the accident and was unaware the emergency room records indicated Shohn had not suffered a loss of consciousness.

Dr. Onischenko only viewed Shohn's school records for a one month period of time beginning on August 27, 1990, and ending on September 28, 1990, almost two years *after* the accident occurred. Dr. Onischenko testified that a complete review of Shohn's past school records *before* and *after* the accident could be significant.

As part of his neuropsychological evaluation, Dr. Onischenko performed approximately fifteen to sixteen different tests on Shohn. Out of the approximately fifteen to sixteen tests conducted, Shohn scored in the normal range on twelve of them. Dr. Onischenko classified his findings and results as being normal and only found "some spotty problems." He felt Shohn was having no problems with his reasoning and logical analysis abilities.

As a result of his examination and testing, Dr. Onischenko recommended a modification in Shohn's school and that he participate in outpatient psychotherapy. Dr. Onischenko concurred in Dr. Lesser's diagnosis of postconcussive syndrome. He further stated Shohn did not have postconcussive syndrome prior to the October accident and that it was possible for the brain to be injured without any damage to the skull or any bleeding inside the skull.

Dr. P. Jeffrey Ewert, a clinical neuropsychologist, is director and owner of the Head Injury Center of Charlotte, North Carolina. Dr. Onischenko referred Shohn to Ewert's clinic for treatment for the effects of his closed head injury. Shohn attended an outpatient brain injury rehabilitation program offered by the clinic. Dr. Ewert assisted Shohn with neurocognitive therapy and cognitive retraining.

Ewert initially saw Shohn on December 2, 1991. On June 17, 1992, he conducted neuropsychological testing on Shohn. He diagnosed Shohn as having a closed head injury caused by the October, 1988 automobile accident. He further diagnosed Shohn as having deficits or problems in the areas of process-

ing speed or thinking quickly. He testified Shohn also had attention problems and cognitive deficiencies.

Dr. Ewert stated it is not unusual for a person later diagnosed with a head injury not to have complained of head trauma or problems relating to the head while in the emergency room. He further stated he had seen patients with closed head injuries who have normal MRI's, CAT scans, and neurological evaluations. He stated adolescents with head injuries have poor anger and impulse control.

Dr. Ewert's prognosis with regard to Shohn was that he would have great difficulty securing and obtaining employment. He stated Shohn continues to have deficits in the areas of sustained attention and that his interpersonal functioning concerned him because of Shohn's impulsivity and poor follow-through.

Ewert recommended an ongoing treatment program whereby Shohn could obtain his GED. He further recommended Shohn participate in a supported employment program in order to be successfully placed in a job. He testified Shohn would require future medical treatment at a cost of $8400. Ewert concluded Shohn's injuries are permanent in nature.

According to his family members, prior to the accident, Shohn was a normal, active twelve year old boy who got along well with other children. He exhibited age appropriate behavior and suffered from no serious illness or disease. He attended a normal public school on a regular basis, did not exhibit behavior problems, and did not require tutoring or special education classes. He liked playing football and basketball and going fishing. He also liked to shoot air rifles and ride bicycles and mopeds.

Before the accident, Shohn got along well with other children. He also had a good relationship with his mother, who never had any problems with him "talking back" or exhibiting "emotional outbursts."

After the accident, Shohn was described as acting like "a little retarded boy." He began to play with toys, such as Tonka toys, which he had not played with since he was two or three years old. He would fight young children over the toys that came with a McDonald's Happy Meal. Unlike normal

boys his age, Shohn wanted to play with three and four year old children rather than other twelve year old boys. He no longer liked to participate in sports or fishing and had not played football or basketball since the collision.

Shohn's performance in school also changed. He was unable to attend school on a regular basis after the accident and received home tutoring for a period of two years following his injury. During this time, he completed the seventh and eighth grades. He only attended school for half-days his ninth grade year. After he returned to school for regular classes, his mother would often have to pick him up early because he was experiencing headaches and crying. Shohn dropped out of school without graduating and has been unable to find employment.

He also experienced problems with his memory after the accident. He became very forgetful. He is unable to remember parts of his childhood and forgets things shortly after being told. Shohn's memory problems resulted in difficulties such as getting in the wrong lunch line or entering the wrong classroom at school, forgetting the reason he went to the store, and paying for gas and then forgetting to pump it.

In addition to the above testimony, Krepps presented a bill for physical therapy and documentation from the emergency room where he was treated immediately after the accident. The emergency room records indicated a diagnosis of multiple contusions. He also presented a bill from an orthopaedic surgeon for treatment of a cervical strain, but presented no further evidence regarding such injury.

Furthermore, throughout the three day trial, Shohn, who was eighteen years old at the time of trial, never testified and never appeared in court. Shohn has a driver's license and an automobile, but chose to remain at home and not attend the trial.

### LAW/ANALYSIS

Krepps argues the trial court erred in failing to grant his initial motion for a new trial absolute based on the inconsistency of the verdicts and in failing to alter or amend judgment to grant him a new trial absolute on the grounds that the jury's verdict was so grossly inadequate as to be the product of

whim, caprice, passion, or other matters outside the record. Krepps contends that, as a result, he is entitled to an order from this court granting him a new trial absolute. Further, he maintains the trial court abused its discretion by excluding photographs of him.

## NEW TRIAL MOTIONS

■ A trial court may grant a new trial absolute on the ground that the verdict is excessive or inadequate. *Rush v. Blanchard*, 310 S.C. 375, 426 S.E.2d 802 (1993). However, the jury's determination of damages is entitled to substantial deference. *Id.* The trial judge must grant a new trial absolute if the amount of the verdict is grossly inadequate or excessive so as to shock the conscience of the court and clearly indicates the figure reached was the result of passion, caprice, prejudice, partiality, corruption or some other improper motives. *See Cock–N–Bull Steak House, Inc. v. Generali Ins. Co.*, 321 S.C. 1, 466 S.E.2d 727 (1996); *McCourt by and through McCourt v. Abernathy*, 318 S.C. 301, 457 S.E.2d 603 (1995); *Allstate Ins. Co. v. Durham*, 314 S.C. 529, 431 S.E.2d 557 (1993); *O'Neal v. Bowles*, 314 S.C. 525, 431 S.E.2d 555 (1993); *Rush, supra.* The failure of the trial judge to grant a new trial absolute in this situation amounts to an abuse of discretion and on appeal this Court will grant a new trial absolute. *Weir v. Citicorp Nat'l Servs., Inc.*, 312 S.C. 511, 435 S.E.2d 864 (1993); *Allstate, supra; O'Neal, supra.*

■ On the other hand a new trial *nisi* is one whereby a new trial is granted unless the party opposing it shall comply with the condition prescribed by it. *Elliott v. Black River Elec. Coop.*, 233 S.C. 233, 104 S.E.2d 357 (1958). The trial judge alone has the power to grant a new trial *nisi* when he finds the amount of the verdict to be merely inadequate or excessive. *McCourt by and through McCourt v. Abernathy*, 318 S.C. 301, 457 S.E.2d 603 (1995); *O'Neal v. Bowles*, 314 S.C. 525, 431 S.E.2d 555 (1993). However, compelling reasons must be given to justify invading the jury's province in this manner. *Bailey v. Peacock*, 318 S.C. 13, 455 S.E.2d 690 (1995); *Pelican Bldg. Ctrs. v. Dutton*, 311 S.C. 56, 427 S.E.2d 673 (1993).

■■■■ Although the trial court may not impose its will on a party by substituting its judgment for that of the jury, the court may in the proper case give the party an option in the way of *additur* or *remittitur,* or, in the alternative, a new trial. *Jones v. Ingles Supermarkets, Inc.,* 293 S.C. 490, 361 S.E.2d 775 (Ct.App.1987), *overruled on other grounds by O'Neal v. Bowles,* 314 S.C. 525, 431 S.E.2d 555 (1993). The consideration of a motion for a new trial *nisi additur* requires the trial judge to consider the adequacy of the verdict in light of the evidence presented. *Patterson v. Reid,* 318 S.C. 183, 456 S.E.2d 436 (Ct.App.1995). The trial judge, who heard the evidence and is more familiar with the evidentiary atmosphere at trial, possesses a better-informed view of the damages than this Court. *Rush v. Blanchard,* 310 S.C. 375, 426 S.E.2d 802 (1993). Accordingly, great deference is given to the trial judge. *Id.*

"When a party moves for a new trial based on a challenge that the verdict is either excessive or inadequate, the trial judge must distinguish between awards that are merely unduly liberal or conservative and awards that are actuated by passion, caprice, or prejudice." *Allstate Ins. Co. v. Durham,* 314 S.C. 529, 530, 431 S.E.2d 557, 558 (1993). The test employed by the court in determining whether or not to set aside a verdict on the grounds of either excessiveness or inadequacy is whether the verdict is so shocking as to manifestly show the jury was moved by considerations not founded on the evidence and/or the instructions of the trial judge. *Toole v. Toole,* 260 S.C. 235, 195 S.E.2d 389 (1973).

■■■■ The trial court's authority to correct, modify, amend, or interfere with the jury's verdict is embraced in and limited to the power to grant new trials. *Anderson v. Aetna Casualty & Sur. Co.,* 175 S.C. 254, 178 S.E. 819 (1934). The court may grant or refuse a new trial or, in a proper case, grant a new trial *nisi,* but should do one thing or the other. *Id.* The grant or denial of new trial motions rests within the discretion of the trial judge and his decision will not be disturbed on appeal unless his findings are wholly unsupported by the evidence or the conclusions reached are controlled by error of law. *Umhoefer v. Bollinger,* 298 S.C. 221, 379 S.E.2d 296 (Ct.App.1989). *See also Boozer v. Boozer,* 300 S.C. 282, 387 S.E.2d 674 (Ct.App.1988) (Court of Appeals has no power to

review trial court's ruling unless it rests on basis of fact wholly unsupported by evidence or is controlled by error of law). In deciding whether to assess error to a court's denial of a motion for a new trial, we must consider the testimony and reasonable inferences to be drawn therefrom in the light most favorable to the nonmoving party. *Umhoefer,* supra.

The court cannot lawfully enter judgment on an inconsistent or incomplete verdict. *Johnson v. Phillips,* 315 S.C. 407, 433 S.E.2d 895 (Ct.App.1993), *rev'd in part on other grounds,* 318 S.C. 453, 458 S.E.2d 427 (1995). When the jury returns a verdict of "no damages" for the plaintiff, the judge should inform the jury he cannot legally accept the verdict. *Id.* Furthermore, he should then return the case to them with instructions explaining nominal and compensatory damages and charging the jury either to assess a definite dollar amount in damages (nominal or actual) for the plaintiff or to return a verdict for the defendant. *Id.* South Carolina law requires the jury to be the sole judge of issues of fact, including the issue of damages. *Id.* at 416–17, n. 7, 433 S.E.2d at 901, n. 7. *See, e.g., Collier v. Green,* 244 S.C. 367, 137 S.E.2d 277 (1964); *Gwathmey v. Foor Hotel Co.,* 121 S.C. 237, 113 S.E. 688 (1922). The Court in *Johnson* stated:

> To permit the court to "correct" or "construe" a jury finding of no damages would, as a practical matter, displace the jury as the fact finder by allowing the court either to decide how the jury viewed the facts or to substitute its own view of the facts when the jury's verdict is uncertain. Under our law, where the case is tried to a jury, the judge cannot perform the jury's function for it. If the jury renders an ambiguous verdict, the court must resubmit the case to the jury, not act as a substitute for the jury.

*Id.* at 417, n. 7, 433 S.E.2d at 901, n. 7.

Moreover, when liability is admitted, a plaintiff is entitled to an award unless proof completely fails. *See Page v. Crisp,* 303 S.C. 117, 399 S.E.2d 161 (Ct.App.1990). In *Page,* the jury returned a verdict in favor of the plaintiff, who brought an action against the defendants for loss of consortium due to a collision between plaintiff's wife and the defendants. The defendants admitted liability in the automobile

accident and a jury awarded plaintiff's wife [3] $44,000 for her injuries. The same jury simultaneously returned a verdict for the plaintiff husband in the amount of "zero dollars." The plaintiff husband appealed from the trial judge's refusal to instruct the jury, after the verdict, to return to the jury room and write a verdict in his favor.

In reversing the trial court, this Court held the plaintiff husband was entitled to a verdict in some amount as a matter of law. The Court noted liability was admitted; the evidence relative to damages sustained by the husband was not disputed nor contested; and the damages to which the husband testified were reasonably to have been expected given the seriousness of the injuries and substantial damages sustained by his wife.

In this case, Ausen admitted liability and the jury returned a verdict for Shohn's mother in the amount of $23,081.81, the amount of the medical bills Shohn incurred as a result of his injuries. Despite such finding for Shohn's mother, the jury returned a verdict of "zero dollars actual and punitive damages" for Shohn. The verdict of zero dollars was inconsistent or incomplete. A verdict for the plaintiff for zero dollars cannot stand. As stated in *Johnson, supra,* the court cannot lawfully accept an inconsistent or incomplete verdict. Therefore, under *Johnson,* the trial court was required to either resubmit the case to the jury or grant a new trial absolute. We thus reverse the trial court's failure to grant a new trial absolute.

## ADMISSIBILITY OF PHOTOGRAPHS

Krepps argues the trial court abused its discretion and committed reversible error when it refused to admit photographs of Shohn which were offered to illustrate the testimony of the Guardian ad Litem. Because the issue may arise on retrial of the case, we address it briefly. At trial, Krepps contended the purpose of the photographs was to introduce Shohn to the jury and to demonstrate Shohn was

---

3. In two separate tort actions, the wife sued the defendants for personal injuries growing out of an automobile accident and the husband brought an action against the same defendants for loss of consortium. The two actions were consolidated for trial.

interested and participating in the normal age appropriate activities prior to the accident.

The admission or exclusion of evidence is a matter within the sound discretion of the trial court. *Recco Tape and Label Co. v. Barfield,* 312 S.C. 214, 439 S.E.2d 838 (1994). Absent an abuse of discretion or error of law, this Court will not disturb the trial court's ruling. *Weir v. Citicorp Nat'l Servs.,* 312 S.C. 511, 435 S.E.2d 864 (1993).

Here, Krepps did not demonstrate an abuse of discretion and was not prejudiced by the exclusion of the photographs. The testimony repeatedly referred to Shohn's activities prior to the accident. Each of the lay witnesses testified about changes they observed in Shohn after the accident and about the activities Shohn engaged in prior to his injury. Therefore, the trial judge did not abuse his discretion in finding the photographs to be cumulative, and thus excluding them.

Accordingly, the order of the trial court denying Krepps's motion for a new trial absolute is reversed and the case is remanded to the trial court for a new trial on damages only.

**REVERSED AND REMANDED.**

CURETON and GOOLSBY, JJ., concur.