603 S.E.2d 417

**Christopher HOLROYD, Gillian Holroyd and American AVK Co., Respondents,**

**v.**

**Michael R. REQUA, Appellant.**

**No. 3852.**

Court of Appeals of South Carolina.

Heard March 10, 2004.

Decided Aug. 9, 2004.

Withdrawn, Substituted and Refiled Sept. 24, 2004.

46

Eugene N. Zeigler, Hamilton Osborne, Jr. and James Y. Becker, all of Columbia, for Appellant.

Justin O'Toole Lucey and Mary L. Arnold, both of Mt. Pleasant, for Respondents.

CURETON, A.J.:

Christopher Holroyd, Gillian Holroyd, and American AVK Company (collectively "Respondents") brought this action against their insurance agent, Michael Requa, alleging various causes of action for misrepresentation, fraud, and negligence stemming from Requa's solicitation and sale of a health insurance policy to Respondents. Requa denied these allegations and claimed Respondents' state law causes of action were preempted and barred by the federal Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 to –1461 (Supp.2003) ("ERISA"). The jury rendered a verdict in favor of Respondents. The trial court subsequently denied Requa's post-trial motions for judgment notwithstanding the verdict and new trial. Requa now appeals. We affirm.

## BACKGROUND

Requa was an insurance agent doing business in Moncks Corner, South Carolina. At the center of this case is a health insurance plan administered by Fidelity Group, Inc., that Requa marketed to American AVK Company for its employees. At issue was whether Requa was liable for Fidelity's failure to pay legitimate medical expense claims filed by Holroyd, one of American AVK's employees.

### Fidelity's Health Insurance Plan

The program administered by Fidelity was not a typical insurance plan. Rather than being developed and sold by a traditional insurance company, the Fidelity plan was the product of an association of several distinct entities.

Around 1995, a purported employee union called the International Workers Guild (IWG) (also known as the Internation-

al Workers Association) entered into a collective bargaining agreement with a purported employer's association, the National Association of Business Owners and Professionals (NABOP).[1] Under this agreement, employees joining IWG would be provided healthcare benefits through a third-party-trust called the International Guild Health and Welfare Trust Fund (IWG Fund). The arrangement provided in part that employers would join the collectively bargained agreement prepared by the organizers of the arrangement with IWG and NABOP. Employees paid membership dues to IWG, and the employers made monthly contributions on behalf of their enrolled employees. The IWG Fund managed the plan, and Fidelity marketed it and administered claims.

Requa was recruited to market the Fidelity plan to his customers by John Branham and Marty Geitler, the exclusive general agents for the Plan. Over the course of two meetings, Branham and Geitler explained the structure and benefits of the Plan and provided Requa with marketing materials prepared by Fidelity. Several months later, Requa executed a marketing agreement to act as agent for the Fidelity Plan.

## Requa's Solicitation of American AVK

In late 1996, Requa sent a letter to American AVK Company, a subsidiary of an international company with offices in California and South Carolina, soliciting interest in a group health insurance program from Fidelity Group, Inc.

The letter described the pricing, benefits, and network of care providers that were included in the Fidelity plan. Requa made various claims in the letter about the quality of the Fidelity plan. He wrote that it offered "great benefits with reasonable prices," had "[a] history of low rate increases and an A+ rate," was "# 1 in benefits compared to other carriers," and was "[l]ocally strong with reciprocal access nationwide." In addition to these more subjective claims, Requa specifically noted that "[t]he Fidelity Group has an average annual rate increase of only 3.4% over the last 8 years." The letter further claimed Fidelity was reinsured through "Reli-

---

1. Testimony from Respondents' witnesses indicated that the entities were not true employer or employee organizations under ERISA. However, the trial court did not make specific findings in this regard, and it is not necessary to our decision in this case.

ance [Reinsurance Company], rated A+ by A.M. Best." [2] The Fidelity plan was the only product promoted in the letter.

Shortly after receiving Requa's letter, American AVK decided to enroll in the Fidelity Plan. American AVK paid monthly premiums for the coverage and the participating employees made monthly contributions.

### Failure of the Fidelity Plan

Within months of American AVK's enrollment in the Plan, Fidelity began having problems paying claims in a timely manner. No later than July 1997, Requa was aware Fidelity was experiencing problems—specifically advising one of his clients that "[t]he Fidelity Group has apparently experienced rapid growth—too soon—without the capacity to handle it."

Also in July 1997, Requa received a letter from the South Carolina Department of Insurance notifying him that the Fidelity Group's insurance plan and Requa's involvement in marketing that plan were the subject of an investigation as to whether Fidelity had complied with state law regulating the sale of insurance. The letter instructed Requa to immediately cease the marketing and sale of the Plan until the Department of Insurance was able to make a final determination.

It is undisputed that Requa did not advise American AVK or its employees of the difficulties experienced by the Fidelity Plan or the ongoing investigation when he learned of the problems. In May 1998, Requa claimed he sent a letter to all of his clients enrolled in the Fidelity Plan, including American AVK, advising them that "your health insurer, The Fidelity Group, has some serious problems and that it may be time to move to another, more competent carrier." Respondents, however, deny ever having received this letter.

### Holroyd's Unpaid Claims

This action arises from unpaid medical claims submitted to Fidelity by one of American AVK's enrolled employees, Christopher Holroyd. Holroyd suffered severe heart attacks in July and October 1998. He incurred approximately $65,000 in medical costs, which Fidelity did not pay. Because Requa

2. A.M. Best Company rates insurance companies based on their financial ability to meet their ongoing obligations.

failed to inform them of Fidelity's problems, Holroyd, his wife, Gillian, and American AVK filed the underlying action against Requa. The jury returned a verdict in favor of Respondents on the charges of negligence, negligent misrepresentation, and breach of fiduciary duty. Respondents were awarded $365,000 in actual damages and $180,000 in punitive damages.

Requa moved for judgment notwithstanding the verdict (JNOV), a new trial absolute, and a new trial nisi remittitur, which were denied. Requa appeals.

## STANDARD OF REVIEW

"In ruling on directed verdict or JNOV motions, the trial court is required to view the evidence and the inferences that reasonably can be drawn therefrom in the light most favorable to the party opposing the motions." *Sabb v. South Carolina State Univ.*, 350 S.C. 416, 427, 567 S.E.2d 231, 236 (2002). The motions must be denied by the trial court when the evidence yields more than one inference or its inference is in doubt. *Steinke v. South Carolina Dep't of Labor, Licensing & Regulation*, 336 S.C. 373, 386, 520 S.E.2d 142, 149 (1999). On appeal from the denial of a motion for a directed verdict or JNOV, this Court will reverse the trial court only where there is no evidence to support the ruling below. *Id.*; *Creech v. South Carolina Wildlife & Marine Res. Dep't*, 328 S.C. 24, 29, 491 S.E.2d 571, 573 (1997).

"Further, a trial court's decision granting or denying a new trial will not be disturbed unless the decision is wholly unsupported by the evidence or the court's conclusions of law have been controlled by an error of law." *Sabb*, 350 S.C. at 427, 567 S.E.2d at 236; *Vinson v. Hartley*, 324 S.C. 389, 405, 477 S.E.2d 715, 722 (Ct.App.1996). In determining whether the judge erred in denying a motion for a new trial, we must look at the testimony and inferences raised therefrom in favor of the nonmoving party. *Welch v. Epstein*, 342 S.C. 279, 302–03, 536 S.E.2d 408, 420 (Ct.App.2000).

## LAW/ANALYSIS

### I. Timeliness of Appeal

■ As a threshold matter, Respondents argue this Court lacks subject matter jurisdiction to consider this appeal be-

cause Requa's post-trial motions were not timely filed. We disagree.

Rule 59(b), SCRCP, provides that "[t]he motion for new trial shall be made promptly after the jury is discharged, or in the discretion of the court not later than 10 days thereafter." In the present case, the jury rendered its verdict on December 20, 2001. Requa filed his post-trial motions twenty-six days later on January 15, 2002. Respondents assert that Requa's failure to make his post-trial motion within the ten days prescribed by Rule 59(b) divests this Court of jurisdiction to review the case.

The jury's verdict in this case did not constitute an adjudication of all the claims in the case. The parties agreed that Respondents' claim brought under the Unfair Trade Practices Act (UTPA) would be submitted to the trial court. The trial court stated at the conclusion of trial that a written order on the UTPA claim would be issued at a later date. Respondents sent Requa a notice on January 8, 2002, that they intended to withdraw their UTPA claim. The UTPA claim, however, was formally withdrawn by Respondents on January 23, 2002.

Rule 54(b), SCRCP, provides:

When more than one claim for relief is presented in an action, whether as a claim, counterclaim, cross-claim, or third-party claim, or when multiple parties are involved, the court may direct the entry of a final judgment as to one or more but fewer than all of the claims or parties only upon an express determination that there is no just reason for delay and upon an express direction for the entry of judgment. In the absence of such determination and direction, any order or other form of decision, however designated, which adjudicates fewer than all the claims or the rights and liabilities of fewer than all the parties shall not terminate the action as to any of the claims or parties, and the order or other form of decision is subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties.

The trial court had not ruled on all of the claims presented at the time the jury rendered its verdict. The trial court also made no "express determination" that there was no reason for delay in entering judgment on the claims that had been

submitted to the jury. Accordingly, the time for filing post-trial motions did not begin to run until the time Respondents' UTPA claim had been withdrawn. Requa filed his post-trial motions within seven days of the informal notice of withdrawal and eight days prior to the formal withdrawal. Requa's post-trial motions were therefore timely under the rules.

Further, this Court generally only lacks jurisdiction over an appeal when the notice of appeal is untimely. The notice of appeal must be served in civil cases within thirty days after receipt of written notice of entry of final order. When a party makes a timely post-trial motion for judgment notwithstanding the verdict, to alter or amend the judgment, or for a new trial, "the time for appeal for all parties shall be stayed and shall run from receipt of written notice of entry of the order granting or denying such motion." Rule 203(b)(1), SCACR. The failure to timely serve a notice of appeal "divests this court of subject matter jurisdiction and results in dismissal of the appeal." *Canal Ins. Co. v. Caldwell,* 338 S.C. 1, 5, 524 S.E.2d 416, 418 (Ct.App.1999).

As previously discussed, Requa timely filed his post-trial motions after the UTPA claim was informally dismissed. The trial court issued his order denying Requa's post-trial motions on January 25, 2002. Requa filed and served his notice of appeal on the same day. Accordingly, Requa served his notice of appeal within the time prescribed by the rules, and this Court has jurisdiction to entertain this appeal.

## II. ERISA Preemption

A primary component of Requa's defense in the present case was his argument that the state law claims Respondents asserted were preempted and barred by ERISA. The trial court denied Requa's motions for directed verdict and for JNOV based on ERISA preemption. Requa appeals these rulings.

Initially, Requa argues one of the trial court's rulings mandated a finding that Respondents' claims were preempted by ERISA. One way to come within the purview of ERISA is if a healthcare plan provided to employees is an "employee welfare benefit plan" (EWBP). Whether a plan is an EWBP is a question of fact. *Int'l Ass'n of Entrepreneurs*

*of Am. Benefit Trust v. Foster*, 883 F.Supp. 1050, 1056 (E.D.Va.1995). A plan can be established as an EWBP if: (1) it is established by a bona fide employer or employee group, and (2) the purpose is to provide the beneficiaries, through the purchase of insurance or otherwise, medical or other benefits. 29 U.S.C. § 1002(1); *Foster*, 883 F.Supp. at 1056.

The trial court in the present case ruled in a pre-trial motion for summary judgment that the healthcare plan "sold by Requa to Plantiffs is and was at all relevant times insurance." At trial, Requa requested that he be permitted to refer to the plan during trial as a "group health insurance plan," and the trial court allowed him to do so. Therefore, Requa argues the trial court determined the plan was a group health insurance plan which qualified as an Employee Welfare Benefit Plan, and thus, ERISA preempted Respondents' state law claims. Although the trial court permitted Requa to refer to the healthcare plan as a group health insurance plan, this does not amount to a legal finding that the plan fell within the purview of ERISA and it does not alter the prior order finding the plan was "insurance." Accordingly, this argument has no merit.

In any event, Congress imposed comprehensive federal oversight of employee benefit plans with the passage of ERISA. ERISA provides for express preemption of "any and all State laws insofar as they may now or hereafter relate to" employee benefit plans. 29 U.S.C. § 1144(a). "A state law claim 'relates to' an employee benefit plan if it has a connection with or reference to the plan." *Heaitley v. Brittingham, Dial & Jeffcoat*, 320 S.C. 466, 469, 465 S.E.2d 763, 765 (Ct.App.1995) (citing *Shaw v. Delta Air Lines Inc.*, 463 U.S. 85, 97, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). Although ERISA's preemption language is broad, state law claims "which affect employee benefit plans in 'too tenuous, remote, or peripheral a manner' do not relate to the plan" and, thus, are not preempted by ERISA. *Id.*; *Dist. of Columbia v. Greater Washington Bd. of Trade*, 506 U.S. 125, 113 S.Ct. 580, 121 L.Ed.2d 513 (1992).

This Court has previously addressed whether certain state law claims for damages due to misrepresentation and professional negligence were preempted by ERISA. In *Heaitley*, a

widow sought damages from her deceased husband's former partnership for continuing to accept his life insurance premiums during his lifetime despite deleting him from the policy. This Court held her state law claim was only "indirectly" related to ERISA in that she was not seeking to recover benefits under the policy. The widow was seeking damages for misrepresentation of coverage. *Heaitley*, 320 S.C. at 469–70, 465 S.E.2d at 765.

In *Medical Park OB/GYN, P.A. v. Ragin*, 321 S.C. 139, 467 S.E.2d 261 (Ct.App.1996), a physician's office relied upon the faulty representations of Ragin in the creation of an employee benefit plan. Because Ragin failed to inform Medical Park regarding mandatory contributions to the plan, the plan was severely underfunded and Medical Park was subject to substantial legal liability. Medical Park sued Ragin for negligent misrepresentation, breach of fiduciary duty, and professional negligence. Noting the purpose of ERISA was to protect the interest of participants in employee benefit plans, this court held that the "relationship between Medical Parks' claims and the regulation or administration of an ERISA plan is too tenuous, remote, or peripheral to trigger pre-emption." *Medical Park*, 321 S.C. at 145, 467 S.E.2d at 264–65. Because adjudication of Medical Park's state law claims would not "affect the rights of any plan participants or beneficiaries and [would] not threaten the uniform regulation or administration of employee benefit plans," this court held the state law claims did not fall within ERISA's preemptive scope. *Id.* at 146, 467 S.E.2d at 265.

The United States Court of Appeals for the Fourth Circuit has also decided that state law claims for professional malpractice were not preempted by ERISA. In *Coyne & Delany Co. v. Selman*, 98 F.3d 1457 (4th Cir.1996), the Fourth Circuit considered whether an employer's professional malpractice claim it brought against an insurance agent was preempted by ERISA. In that case, as in the present case, the employer alleged it had been fraudulently induced by the insurance agent to purchase group health insurance for its employees. *Id.* at 1463–64. The Fourth Circuit held that fraudulent inducement claims against insurance agents were not preempted, finding that:

We believe that [plaintiff's] malpractice claim against insurance professionals is a "traditional state-based law[ ] of general applicability [that does not] implicate the relations among the traditional ERISA plan entities," including the principals, the employer, the plan, the plan fiduciaries and the beneficiaries. There is no question that [plaintiff's] malpractice claim is rooted in a field of traditional state regulation. Common law professional malpractice, along with other forms of tort liability, has historically been a state concern. Moreover, a common law professional malpractice claim is "a generally applicable [law] that makes no reference to, or functions irrespective of, the existence of an ERISA plan." The state law at issue in this case imposes a duty of care on all professionals, including all insurance professionals. Common law imposes the duty of care regardless of whether the malpractice involves an ERISA plan or a run-of-the-mill automobile insurance policy. Thus, the duty of care does not depend on ERISA in any way. Finally, the state law malpractice claim does not affect relations among the principal ERISA entities. Defendants' malpractice, if any, occurred before the faulty plan went into effect and before defendants began to act as Plan Administrator and Plan Supervisor. Accordingly, the claim is asserted by [plaintiff], in its capacity as employer, against the defendants in their capacities as insurance professionals, not in their capacities as ERISA fiduciaries.

*Id.* at 1471 (internal citations omitted).

Turning to the instant case, we similarly find the state law claims are not preempted by ERISA. Respondents brought claims of misrepresentation, fraud, and negligence against Requa. Respondents sought damages from Requa for his professional malpractice in failing to adequately investigate the Fidelity plan and in failing to inform them when it became evident that the Fidelity plan had problems. The malpractice claims are rooted in the common law of tort liability. Like the malpractice claims in *Heaitley* and *Medical Park*, these common law claims do not impact—even in a tenuous fashion—employee benefit structures or their administration, bind employers or plan administrators to particular choices, or preclude uniform administrative practice.

Furthermore, Respondents' claims are not aimed at obtaining ERISA benefits. Rather, they brought this action seeking damages proximately caused by Requa's misrepresentations in marketing the Fidelity Plan and his negligent failure to apprise Respondents of the Plan's financial and regulatory difficulties. If Respondents prevail on their claims, Requa will be liable in his individual capacity for his negligence as an insurance professional. Thus, the connection between the state law claims and the employee benefit plan is so tenuous such that ERISA does not preempt them.

For these reasons, we cannot say that the common law tort action at issue in this case "relate[s] to any employee benefit plan" within the meaning of 29 U.S.C. § 1144(a). Accordingly, we find there was evidence to support the trial court's denial of Requa's motions for directed verdict and JNOV.[3]

### III. Contested Evidentiary Rulings

Requa next appeals several of the trial court's rulings on evidentiary matters raised at trial. We address each of these issues separately below.

 The decision to admit or exclude evidence is within the trial court's sound discretion. *Washington v. Whitaker*, 317 S.C. 108, 118, 451 S.E.2d 894, 900 (1994); *Haselden v. Davis*, 341 S.C. 486, 497, 534 S.E.2d 295, 301 (Ct.App.2000). The judge's ruling to admit or exclude evidence will only be reversed if it constitutes an abuse of discretion amounting to an error of law. *Carlyle v. Tuomey Hosp.*, 305 S.C. 187, 192, 407 S.E.2d 630, 633 (1991). To warrant reversal, however, Requa "must show both the error of the ruling and the resulting prejudice." *Recco Tape & Label Co. v. Barfield*, 312 S.C. 214, 216, 439 S.E.2d 838, 840 (1994).

---

3. We also note that Requa admits in his brief that it was his burden to prove the existence of a recognized ERISA plan before the trial court could determine whether state law claims were preempted. He also admits that the fact of whether the Fidelity plan was an ERISA plan was "a question of fact that has yet to be determined." Requa's admitted failure to provide any evidence at trial that the plan was an ERISA plan is an additional ground supporting the trial court's decision to deny his motions for directed verdict and JNOV.

## A. Admission of Evidence as to Unpaid Medical Bills and Premiums Paid

 Requa argues the trial court erred by admitting evidence of the amount of premiums paid and unpaid medical bills for Holroyd and other employees enrolled in the Plan. He essentially argues that the jury should not have considered evidence of the total amount of premiums paid by American AVK on behalf of all of its employees when the only employee joined in the lawsuit was Holroyd. We find no error.

At the start of the trial, Requa moved to exclude evidence of the amount of premiums paid and the amount of the unpaid claims under the Fidelity plan, arguing the evidence of both amounted to a claim for rescission and would be confusing to the jury. The trial court denied the motion. However, Requa himself testified during the trial that the Holroyds had $65,000 in unpaid medical bills and that $15,000 in premiums had been paid to Fidelity. Requa later withdrew his objection to the presentation of the medical bills. The Holroyds testified, without objection, regarding the receipt and amount of unpaid medical bills. Although Requa moved for directed verdict at the end of Respondents' case, he argued the evidence of both the premiums and unpaid medical bills was not the proper measure of damages.

Requa also argued in his post-trial motion to alter or amend the judgment that the evidence of both medical bills and the premiums paid was not proper measures of damages, was irrelevant, or, if relevant, was more prejudicial than probative. The trial court ruled that both the medical bills and the premiums paid were appropriate to be submitted on Respondents' claims. The court further noted that even if the jury inappropriately considered the total amount of premiums paid, it was impossible to determine that fact as the jury returned a general verdict.

 There are preservation problems with Requa's issue on appeal. Although Requa opposed the introduction of the evidence of medical bills and premiums paid before the testimony, after the testimony, and in a post-trial motion, he did not object when the evidence was actually introduced during the trial. In fact, the evidence that Requa complains about in this appeal was also elicited from his own testimony without

objection. Failure to object to the introduction of evidence at the time the evidence is offered constitutes a waiver of the right to have the issue considered on appeal. *See Doe v. S.B.M.,* 327 S.C. 352, 356, 488 S.E.2d 878, 880 (Ct.App.1997) (holding that a contemporaneous objection is "required to properly preserve an error for appellate review"); *Cogdill v. Watson,* 289 S.C. 531, 537, 347 S.E.2d 126, 130 (Ct.App.1986) ("The failure to make an objection at the time evidence is offered constitutes a waiver of the right to object."). Because Requa failed to object at the time the evidence was introduced, we do not believe this issue is preserved for appellate review.

### B. Requa's Request to Cross-examine Respondents Regarding Allegations Made in the Original Complaint

 Requa next argues the trial court erred by not allowing him to cross-examine Respondents regarding a statement in their original complaint.

One of the contested issues at trial was whether Requa informed American AVK that there were problems with Fidelity. Respondents' original complaint stated that they had received a letter from Requa in May 1998 informing them that their "health insurer, the Fidelity Group, has some serious problems and that it may be time to move to another more competent carrier." Respondents filed an amended complaint which did not include the assertion that Requa wrote them to inform them of the problems with Fidelity.

At trial, Requa sought to cross-examine Holroyd about the assertion in the original complaint. Respondents objected, claiming the statement was inadvertently copied from a complaint filed in a separate action. The trial court concluded the statement in the original complaint was the result of a scrivener's error and its inadvertent inclusion in the original complaint should not be allowed to prejudice Respondents. We find no error.

Our courts have corrected scriveners' errors when warranted. *See Canal Ins. Co. v. Caldwell,* 338 S.C. 1, 7, 524 S.E.2d 416, 419 (Ct.App.1999) (finding that a party was not bound by a scrivener's error regarding commencement time on insurance policy). In this case, Requa understood the statement

had been culled from another complaint and acknowledged this at trial. Furthermore, Requa did not object when Respondents amended their complaint to delete the statement. Because there was evidence to support the trial court's ruling on this matter, the judge did not err in denying Requa's motion for a new trial as to this issue.

### C. Unpaid Medical Bills of Others

 During cross-examination, Requa admitted that his policyholders have "a million dollars in unpaid claims." Requa's counsel objected, a bench conference was held, and Requa's cross-examination continued. During closing arguments, Respondents' counsel argued that "there's a million dollars in unpaid claims on Requa...." Requa's general objection was sustained. However, without objection from Requa, the trial court had Requa's testimony regarding his policyholders' unpaid claims read to the jury prior to deliberations.

Requa failed to place the grounds for his first objection on the record, failed to request a curative instruction when the testimony was referred to during closing arguments, and failed to object when the trial court ordered the testimony read to the jury. Accordingly, this issue is not preserved for appellate review. *Wilder Corp. v. Wilke,* 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) (holding that an objection must be sufficiently specific to inform the trial court of the point being urged by the objector); *State v. Patterson,* 324 S.C. 5, 18, 482 S.E.2d 760, 766 (1997) (holding that where a party objects to closing arguments and the objection is sustained, but counsel did not move to strike or request a curative instruction, the issue is not preserved for appellate review); *see also Murray v. Bank of America,* 354 S.C. 337, 347, 580 S.E.2d 194, 200 (Ct.App.2003) (same); *Doe v. S.B.M.,* 327 S.C. at 356, 488 S.E.2d at 880 (holding that a contemporaneous objection is "required to properly preserve an error for appellate review").

### D. Evidence of Damage to Respondents' Credit Rating

 Requa next argues the trial court erred by allowing testimony regarding damage to the Holroyds' credit rating. We disagree.

Requa testified at trial that unpaid medical bills could affect the Holroyds' credit rating. Without objection, Gillian Holroyd testified that because Holroyd's medical bills remained unpaid, they feared losing their home, and they were receiving distressing telephone calls from creditors. No evidence was admitted regarding the Holroyds' credit rating or any changes to the rating.

In his motion for a new trial, Requa complained about Gillian Holroyd's testimony, arguing he was denied access to the Holroyds' credit reports prior to trial. In denying the motion for a new trial on this issue, the trial court found Gillian's testimony was cumulative to Requa's own testimony and that Requa had failed to argue anything regarding denial of access to credit reports before the motion for a new trial.

We first note that the evidence submitted on this issue, without objection, only indicated that the Holroyds had outstanding bills and were receiving distressing telephone calls from creditors. There was no evidence with regard to the credit ratings of the Respondents. In his argument in support of this issue, Requa even admits that no evidence was submitted with regard to Gillian Holroyd's or American AVK's credit ratings. Because no evidence of credit ratings was admitted at trial, Requa's argument has no merit.

Further, Gillian Holroyd's testimony was cumulative to Requa's testimony, and the evidence regarding the distressing phone calls was admitted without objection. As such, the issue is not preserved for appellate review. *Doe v. S.B.M.*, 327 S.C. at 356, 488 S.E.2d at 880.

Because there is evidence to support the trial court's ruling, we find no error with the denial of the new trial motion based on the credit rating "evidence."

### E. Evidence of Future Damages

Requa next argues that the trial court erred by admitting evidence of future damages in the form of increased premiums for health insurance Holroyd will be forced to pay, allegedly due to the Fidelity Plan's failure to pay Holroyd's legitimate medical expense claims. We find no error.

■ "Under current South Carolina law, the standard of admissibility for evidence of future damages is 'any evidence which tends to establish the nature, character, and extent of injuries which are the natural and proximate consequences of the defendant's acts . . . if otherwise competent.'" *Pearson v. Bridges,* 344 S.C. 366, 372, 544 S.E.2d 617, 620 (2001) (quoting *Martin v. Mobley,* 253 S.C. 103, 109, 169 S.E.2d 278, 281–82 (1969)).

During Requa's testimony, he admitted that Holroyd's premiums would increase substantially due to his heart attack. Without objection, Holroyd's expert, John O'Brien, testified that Holroyd would have a difficult time getting health insurance and he would be plagued with "hefty" premiums because his heart condition would be considered a preexisting condition.

Respondents offered expert testimony that Holroyd's heart condition will be considered a preexisting condition when he signs on with a new insurance carrier. Because of the preexisting condition, he will be required to pay a much higher rate for insurance coverage than he had in the past. Had the Fidelity Plan honored its commitment to pay the legitimate medical claims of its enrollees, the need for Holroyd to obtain new coverage would not have arisen. Instead, Holroyd was left without coverage and in the market for a new insurer at the time he was recovering from a catastrophic illness. If, as the jury found, Requa was negligent in his failure to investigate the adequacy of the Fidelity Plan and had represented the Plan accurately when marketing it to American AVK, the Holroyds may have never been subject to paying the higher premiums the expert projected. Allowing the jury to consider evidence of future damages is, therefore, wholly appropriate.

### F. Use of Mortality Tables in Assessing Future Damages

■ Requa also argues the trial court erred in charging the jury on the mortality tables to quantify Holroyd's future damages. Here, too, we find no error.

■ The trial court must charge the current and correct law applicable to issues raised in the pleadings and supported by the evidence. *Clark v. Cantrell,* 339 S.C. 369,

390, 529 S.E.2d 528, 539 (2000). When reviewing a jury instruction for error, this court must consider the charge " 'as a whole in light of the evidence and issues presented at trial.' " *Keaton ex rel. Foster v. Greenville Hosp. Sys.*, 334 S.C. 488, 497, 514 S.E.2d 570, 575 (1999).

The Legislature has provided life expectancy tables to be considered when it is necessary in civil actions to determine the life expectancy of any person. *See* S.C.Code Ann. § 19–1–150 (1985) ("When it is necessary, in any civil action or other mode of litigation, to establish the life expectancy of any person from any period in his life, whether he be living at the time or not, the table below shall be received in all courts and by all persons having power to determine litigation as evidence (along with other evidence as to his health, constitution and habits) of the life expectancy of such person.").[4]

During the charge conference, the parties debated whether the mortality tables should be charged to the jury. Requa argued that under ERISA, Holroyd would have "credible coverage that would have extended to any future coverage" such that future damages, and the mortality tables, were not an issue. Noting there was evidence in the record regarding future damages in the form of increased premiums, the trial court decided to give the charge concerning the mortality tables. The jury was instructed as follows:

Now, at this time, Mr. Holroyd is 52 years of age. We have in this state a statute that has been established by way of actuarial study that states what one's life expectancy should be at a certain age. This is allowed into evidence at a trial. At this age, 52, Mr. Holroyd, has a life expectancy of 23.7 years. In determining how long one would live, you may consider life expectancy. You may also consider other evidence in the case which bears on his health, age, physical condition, or any other factors that you deem appropriate in determining whether or not you would—in determining how you would use that life expectancy.

You would not use that life expectancy at all unless you determined that Mr. Holroyd would have some damages in

4. This statute was amended in April 2004. The amendment has no effect on the issue in this case.

the future. That has nothing to do with what has happened, has only to do with what may happen in the future.

Requa informed the trial court that he had no objections to the instructions. In his post-trial motions, however, Requa argued that charging the mortality tables was error because any increase in premiums was due to the heart attack, not Requa's actions and the future damages were in contravention of federal law. The trial court denied the motion, finding there was evidence to support the charge and Requa failed to object after the instruction was given.

Even assuming Requa properly preserved this argument for appellate review, we find no error with the instruction. There was evidence that Holroyd would suffer future damages due to increased premiums. The jury could properly consider the mortality tables to determine the amount of future damages. Because there was evidence to support the charge, the trial court correctly instructed the jury with regard to the mortality tables. The trial court did not err in denying Requa's post-trial motion with regard to this issue.

## IV. Change of Venue

Requa next argues the trial court erred by failing to grant his motion for change of venue. We disagree. "A motion for a change of venue is addressed to the sound discretion of the trial judge and will not be disturbed absent an abuse of discretion." *State v. Kelsey*, 331 S.C. 50, 67, 502 S.E.2d 63, 71 (1998).

This action was filed in Charleston County in January 1999. Requa did not assert the defense of improper venue in his pleadings, and he did not file his motion for change of venue until April 2000. The matter did not ultimately come before the trial court for hearing until February 2001, at which time the case had already been placed on the trial roster and was subject to being called for trial at any time. Moreover, there is evidence that most of the discovery had been completed prior to the hearing.

Requa points out that the right of a defendant to be tried in the county of his residence is a substantial right and argues he did not waive that right. A defense of improper venue may be waived if not made by motion under Rule 12,

SCRCP, or raised as an affirmative defense in a responsive pleading. *Henley v. North Trident Reg'l Hosp.*, 275 S.C. 193, 195, 269 S.E.2d 328, 328 (1980) (holding that the right to be tried in the county of one's residence, "while it is a 'substantial and valuable right,' ... relates only to the question of venue and can be waived").

In *Henley*, our supreme court held that the defendant's failure to challenge venue until five months after the complaint had been filed was unreasonable, and he had therefore waived his right to be tried in the county of his residence. We find the same result is warranted in the present case where it was fifteen months after the original complaint was filed before he challenged venue.

Accordingly, we find the trial court did not abuse its discretion in denying Requa's motion for change of venue.

## V. Damages

Requa next argues the trial court erred in failing to grant his motion for a new trial or, in the alternative, a new trial nisi remittitur on the grounds the damages awarded by the jury were grossly disproportionate to the evidence. We disagree.

"When a party moves for a new trial based on a challenge that the verdict is either excessive or inadequate, the trial judge must distinguish between awards that are merely unduly liberal or conservative and awards that are actuated by passion, caprice or prejudice." *Allstate Ins. Co. v. Durham*, 314 S.C. 529, 530, 431 S.E.2d 557, 558 (1993). The trial court must set aside a verdict only when it is shockingly disproportionate to the injuries suffered and thus indicates that passion, caprice, prejudice, or other considerations not reflected by the evidence affected the amount awarded. *Vinson*, 324 S.C. at 404, 477 S.E.2d at 723. In other words, to warrant a new trial absolute, the verdict reached must be so "grossly excessive" as to clearly indicate the influence of an improper motive on the jury. *Rush v. Blanchard*, 310 S.C. 375, 379–80, 426 S.E.2d 802, 805 (1993). Although the decision to grant or deny a new trial absolute based on the excessiveness of a verdict rests in the sound discretion of the trial court, an abuse of discretion occurs if the trial court's findings are wholly unsupported by the evidence or the conclusions

reached are controlled by an error of law. *Krepps v. Ausen,* 324 S.C. 597, 607, 479 S.E.2d 290, 295 (Ct.App.1996).

■ Requa first claims the jury's award of $365,000 in actual damages is unsupported by the evidence because Respondents only presented evidence of $65,000 in unpaid medical bills. The evidence offered by Respondents not only included unpaid medical bills, but also included embarrassment, humiliation, credit problems, increased future insurance premiums, stress, premiums paid, and decreased coverage due to preexisting conditions in a new policy. We find no reason, therefore, to disturb the jury's verdict.

■ With respect to punitive damages, Requa argues the jury's award of $180,000 was clearly motivated by passion, caprice, and prejudice. Here, too, we see no reason to disturb the trial court's finding that the punitive damages award was supported by and not disproportionate to the evidence. The trial court separately listed and addressed the eight factors required in a post-trial review of punitive damages awards under our Supreme Court's ruling in *Gamble v. Stevenson,* 305 S.C. 104, 406 S.E.2d 350 (1991). Requa's culpability, knowledge, and ability to pay are amply supported by the evidence contained in the record.

In light of all the evidence presented, we find the trial court did not abuse its discretion in finding the actual and punitive damages were not disproportionate to the evidence.

## CONCLUSION

For the reasons stated above, we find: that the Respondents' claims were not preempted by federal ERISA laws; that the trial court correctly ruled on Requa's evidentiary objections; that Requa's motion for a change of venue was correctly denied; and that the trial court did not abuse its discretion in denying Requa's motions for new trial. The judgment of the trial court is therefore

**AFFIRMED.**

HUFF and STILWELL, JJ., concur.